UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| AHMED HUQ, Individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>RECONNAISSANCE ENERGY AFRICA LTD. f/k/a LUND ENTERPRISES CORP., JAMES JAY PARK, SCOT EVANS, IAN D. BROWN, CARLOS ESCRIBANO, SHIRAZ DHANANI, MARK GERLITZ, JAMES GRANATH, CLAIRE PREECE, NDAPEWOSHALI SHAPWANALE, CHRIS GILMOUR, and SINDILA MWIYA,<br><br>        Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><u>JURY TRIAL DEMANDED</u><br><br><u>CLASS ACTION</u> |

Plaintiff Ahmed Huq ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") and the Canadian Securities Administrators System for Electronic Document Analysis and Retrieval ("SEDAR") filings by Reconnaissance Energy Africa Ltd. f/k/a Lund Enterprises Corp. ("ReconAfrica" or the "Company"), as well as media and analyst reports about the Company and Company press releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants (defined below) who purchased or otherwise acquired the publicly traded securities of ReconAfrica between February 28, 2019 and September 7, 2021, both dates inclusive (the "Class Period").  Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.      Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.  Additionally, Defendant James Granath, as repeatedly stated by the Company, teaches at the State University of New York at Stony Brook.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

7.      Defendant ReconAfrica purports to engage in the identification, exploration, and development of oil and/or gas assets in Namibia and Botswana, including in the Kalahari Desert and other fragile areas.  Defendant ReconAfrica purports to hold a 90% interest in a petroleum exploration license that covers an area of approximately 25,341.33 km$^2$ located in Namibia; and 100% working interest in a petroleum license, which covers an area of 9,921 km$^2$ located in northwestern Botswana.  These licenses are reflected in the map below found in the Company's SEDAR filings.



8.     Defendant ReconAfrica is incorporated in Canada and maintains its principal executive offices at PO Box 48326 Bentall, Vancouver, BC, V7X 1A1, Canada.[1]  ReconAfrica's shares are listed and trade on the OTCQX (previously OTC Pink) under the ticker symbol "RECAF" and were previously under the ticker symbol "LGDOF."

9.     Defendant James Jay Park ("Park") serves the Chairman of the Board of Directors and previously served as the Company's Chief Executive Officer ("CEO") from May 2018 until August 2020.

10.     Defendant Scot Evans ("Evans") has served as the Company's CEO since August 2020 and previously served as the Company's Chief Operating Officer from April 2020 until August 2020.

11.     Defendant Ian D. Brown ("Brown") served as a Director of the Company from September 2019 until January 2020 and served as the Company's Chief Financial Officer ("CFO") from September 2019 until January 2020.

12.     Defendant Carlos Escribano ("Escribano") has served as the Company's CFO since January 2020.

13.     Defendant Shiraz Dhanani ("Dhanani") served as a Director of the Company from February 2020 until February 2021.  Currently Defendant Dhanani is an advisor and consultant to the Company.

14.     Defendant Mark Gerlitz ("Gerlitz") has served as a Director of the Company since February 2021.

---

[1] Previously, the Company stated it maintained its principal executive offices at Level 1, Devonshire House, One Mayfair Place, London, UK W1J 8AJ.  Currently it lists the above Canadian postal box

15.     Defendant James Granath ("Granath") serves as a Director and a member of the Company's technical team.

16.     Defendant Claire Preece ("Preece") serves as the Company's spokesperson.

17.     Defendant Ndapewoshali Shapwanale ("Shapwanale") serves as the Company's spokesperson.

18.     Defendant Chris Gilmour ("Gilmour") serves as a spokesperson for the Company. ReconAfrica hired Defendant Gilmour through Beattie Communications,[2] a U.K.-based public relations firm.

19.     Defendant Sindila Mwiya ("Mwiya") serves as the Company's consultant through his Risk-Based Solutions (RBS) CC entity.

20.     Defendants Park, Evans, Brown, Escribano, Dhanani, Gerlitz, and Granath, are collectively referred to herein as the "Individual Controlling Defendants":

21.     Each of the Individual Controlling Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

---

[2] Earlier in 2021, tigerbond Group Ltd., another U.K.-based public relations firm, acquired Beattie Communications

(g)     approved or ratified these statements in violation of the federal securities laws.

22.     Defendants Preece, Shapwanale, Gilmour, and Mwiya are collectively referred to as the "Individual Spokespeople Defendants".

23.     The Company is liable for the acts of the Individual Controlling Defendants, Individual Spokespeople Defendants, and its other employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

24.     The scienter of the Individual Controlling Defendants, Individual Spokespeople Defendants, and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

25.     The Company, the Individual Controlling Defendants, and the Individual Spokespeople Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background Information

26.     The Okavano Delta is a United Nations Educational, Scientific and Cultural Organization ("UNESCO") World Heritage site, described as a:

> delta in north-west Botswana comprise[d of] permanent marshlands and seasonally flooded plains. It is one of the very few major interior delta systems that do not flow into a sea or ocean, with a wetland system that is almost intact. One of the unique characteristics of the site is that the annual flooding from the River Okavango occurs during the dry season, with the result that the native plants and animals have synchronized their biological cycles with these seasonal rains and floods. It is an exceptional example of the interaction between climatic, hydrological and biological processes. The Okavango Delta is home to some of the world's most endangered species of large mammal, such as the cheetah, white rhinoceros, black rhinoceros, African wild dog and lion.

The Okavango Delta system is also protected under the Ramsar Convention on Wetlands of International Importance Especially as Waterfowl Habitat (also called the Convention on the Wetlands).

27.     The Okavango River flows through Angola, Namibia, and Botswana into the Okavango Delta.  Due to the dry nature of the Kalahari Desert, which covers much of Namibia and Botswana, conflicts over the river and its water are not uncommon and are international in scale.

28.     The Kavango Region was a first-level subnational administrative division of Namibia, until it split in 2013 into Kavango East and Kavango West.  Prior to 1998, the Region was named Okavango.

29.     The Kavango-Zambezi Transfrontier Conservation Area ("KAZA" or the "KAZA TFCA") is situated in the Kavango and Zambezi river basins where the borders of Angola, Botswana, Namibia, Zambia, and Zimbabwe converge.  It includes an area of approximately 520,000 km$^2$ which hold a variety of protection schemes with 20 national parks, 85 forest reserves, 22 conservancies, 11 sanctuaries, 103 wildlife management areas, and 11 game management areas as well as the Okavango Delta and Victoria Falls, among other natural wonders.  The KAZA Treaty was signed in 2011 by the Presidents of Angola, Botswana, Namibia, Zambia, and Zimbabwe.

30.     A "play" is a specific set of geological conditions, defined by source, maturity, migration route, reservoir, trap and seal, which is conducive to the existence of oil or gas within a geographically defined region.

31.     Unconventional oil and gas extraction includes horizontal drilling and hydraulic fracturing (also called "fracking").  The difference between conventional and unconventional wells

can be seen in the below image from a report by the British Columbian Ministry of Natural Gas Development and Minister Responsible for Housing:



**<u>Materially False and Misleading Statements</u>**

32.    On February 28, 2019, the Company, then-named Lund Enterprises Corp., filed on SEDAR a management information circular[3] (the "2019 Circular") which stated the following regarding the Company's Namibian interest following the merger with 1163631 B.C. Ltd.:

> ***Reconnaissance is targeting equivalent rocks to the hydrocarbon-prone unconventional deposits within the Karoo Group of the Main Karoo Basin in South Africa.[4]*** The main producing formations within the Main Karoo Basin are the Prince Albert, Whitehill and Collingham, and all of the Lower Ecca Group.

*       *       *

---

[3] All footnotes included in the block quote from the 2019 Circular are added for context and did not appear in the 2019 Circular.

[4] Energy extraction in the Karoo, a semi-arid region of South Africa, including the Karoo Group is controversial and likely would include fracking.

*To estimate the formation volume factor for oil (Bo), Sproule[5] used the data for unconventional plays in North America summarized in the EIA/ARI World Shale Gas and Shale Oil Resource Assessment* (May 17, 2013). Different formations with normal or slightly over-pressured reservoirs (Barnett, Wolfcamp, Niobrara) were reviewed for their Bo value. As a result, the range of Bo between 1.1 and 1.5 was used for the distribution.

\*        \*        \*

*In Namibia, all rights in relation to the exploration for, the production and disposal of, and the control over petroleum vest in the state.* The Petroleum (Exploration and Production) Act 2 of 1991 (Namibia), together with the Petroleum (Taxation) Act 3 of 1991 (Namibia) are the principal laws regulating the granting and transfer of petroleum licences to explore for and produce petroleum within the Republic of Namibia. Prior to a petroleum licence being granted, the Petroleum (Exploration and Production) Act 2 of 1991 (Namibia) requires that the Minister of Mines and Energy enter into a petroleum agreement with the licence applicant containing the terms and conditions applicable to such licence and possible future licences, including production licences.

\*        \*        \*

*The recovery factor ranges for gas and oil were estimated using Sproule's internal data and general knowledge of the shale[6] and "hybrid" plays in North America such as the Montney,[7] Bakken,[8] Barnett[9] and Eagle Ford.[10]* The range of recovery factors for gas was estimated at 20 to 60 percent, while the range of recovery factors for oil was estimated at about 2 to 14 percent.

(Emphasis added.)

33.    On September 5, 2019, the Company filed on SEDAR a Material Change Report on Form 51-102F3 which incorporated an earlier press release and the 2019 Circular.

---

[5] Defendant ReconAfrica hired Sproule International Limited ("Sproule") to complete assessments detailed in reports of its Namibian and later Botswanan interests.

[6] Modern shale energy extraction often involves fracking.

[7] The Montney Formation is located in Western Canada and its energy extraction includes fracking.

[8] The Bakken Formation is located in Western Canada and the Western United States and its energy extraction includes fracking.

[9] Barnett Shale is located in Texas and its modern energy extraction involves fracking.

[10] Eagle Ford Shale (also called the Eagle Ford Group) is largely located in Texas and its energy extraction involves fracking.

34.      On October 7, 2019, the Company issued a press release entitled "RECONAFRICA ANNOUNCES GRANT OF ENVIRONMENTAL CLEARANCE CERTIFICATE FOR NAMIBIA DRILLING OPERATIONS" which stated the following regarding the Company's objectives and its social, legal, and environmental obligations and practices, in pertinent part:

> *The primary objective of the initial multi well drilling program is to establish an active petroleum system, of which the main target is the Permian marine shales.* The secondary objective is the evaluation of conventional hydrocarbon bearing stratigraphy.
>
> *"The grant of the Environmental Clearance Certificate resulted from the extensive preparations by ReconAfrica, including public hearings in East Kavango and West Kavango, with no objections expressed by local communities."* stated Jay Park, CEO of ReconAfrica. "Further, we are pleased with the ongoing support we have received for our planned operations, at all levels of Namibia's government."

(Emphasis added.)

35.      On October 28, 2019, the Company filed on SEDAR on Form 51-102F1 its Management Discussion and Analysis for the Year Ended June 30, 2019, which incorporated the 2019 Circular and stated the following, in pertinent part:

> Additional information related to RECO [ReconAfrica] is available for view on SEDAR at www.sedar.com. *Readers are in particular referred to the SEDAR posting dated February 28, 2019 of a management information circular (the "Circular") under the SEDAR heading "Proxy Circular".* The Circular provides extensive information about the RTO.
>
> *       *       *
>
> The Company does not believe in the short run planning horizon that it faces significant issues arising from environmental concerns. The project on the Licence area in Namibia is an early stage exploration project and our exploration activities to date have not resulted in any meaningful disturbances on the project lands; therefore, there is not a basis on which to estimate any reclamation and remediation provision. We also do not believe there are any meaningful issues arising from climate change matters.

(Emphasis added.)

36.    Also on October 28, 2019, Defendants Brown and Park signed and filed certifications of annual filings on Form 52-109FV1 on SEDAR.

37.    On October 31, 2019, the Company issued a press release entitled "RECONAFRICA ANNOUNCES C $1.5 MILLION PRIVATE PLACEMENT AND SCOT EVANS, FORMERLY WITH HALLIBURTON, JOINS THE COMPANY" which stated the following, in pertinent part, regarding Defendant Evans' unconventional extraction experience:

> Joining the Company on November 4, 2019, Scot Evans is an energy industry leader with a combined 35 years of experience with Exxon, Landmark Graphics and Halliburton. Mr. Evans was Vice President of Halliburton's Integrated Asset Management and Technical Consulting organizations, where he grew production from 20K to over 100K barrels of oil equivalent per day, creating the equivalent of a Mid-Cap upstream oil company. ***Mr. Evans' experience in the US extends to the Delaware, Midland, Eagle Ford and Monterey plays***, and internationally in Algeria, Kuwait, India, Russia, Ecuador and Mexico. ***He is an expert in developing unconventional resources.***

> "We are looking forward to the contributions Scot will make to ReconAfrica's operations in developing the Kavango Basin," stated Jay Park, CEO of ReconAfrica. "***His vast experience in unconventional and conventional resources*** along with his depth of knowledge in latest industry technologies will prove to be a major asset to the Company."

> ReconAfrica is a junior oil and gas company engaged in the development of the ***newly discovered Kavango Sedimentary Basin***, in northeast Namibia, where the Company holds a 90% working interest in petroleum licenses, comprising approximately 6.3 million contiguous acres.

(Emphasis added.)

38.    On November 29, 2019, the Company filed on SEDAR on Form 51-102F1 its Management Discussion and Analysis for the Nine Months Ended September 30, 2019, which incorporated the 2019 Circular.

39.    Also on November 29, 2019, Defendants Brown and Park signed and filed certifications of annual filings on Form 52-109FV1 on SEDAR.

40.     On April 28, 2020, the Company filed on SEDAR on Form 51-102F1 its Management Discussion and Analysis for the Year Ended December 31, 2019, which stated the following incorporating the 2019 Circular and regarding the Company's social, legal, and environmental obligations and practices, in pertinent part:

> ***Additional information is available on the Company's profile on SEDAR at www.sedar.com, including a posting dated February 28, 2019 of a management information circular (the "Circular") under the SEDAR heading "Proxy Circular".***
>
> *            *            *
>
> On October 7, 2019, the Company announced that it had received its Environmental Clearance Certificate ("Drilling Permit") from the Office of the Environmental Commissioner, Namibia Ministry of Environment and Tourism, covering the entire PEL 73 permit. The Drilling Permit authorizes ReconAfrica to commence drilling of numerous wells, to unrestricted depths, ***in the Kavango Basin***, in Namibia, until August 26, 2022. The primary objective of the initial multiwell drilling program is to establish an active petroleum system, of which the main target is the Permian marine shales. The secondary objective is the evaluation of conventional hydrocarbon bearing stratigraphy. Subsequent to the year ended December 31, 2019, ReconAfrica acquired a Crown 750 drilling rig for $2,379,060 (US$1,800,000). The Crown 750 drilling rig will be outfitted with a best-in-class top drive system (for faster drilling rates) and ancillary equipment ***to acclimate the rig for drilling in the Kalahari Desert***. These incremental improvement costs will be approximately US$1.2 million. Therefore, all-in costs when the rig is ready to transport are estimated to be approximately US$3 million.
>
> *            *            *
>
> ***The Company mitigates these [regulatory] risks by employing qualified personnel and management, utilizing third party specialists as required*** and by maintaining an acceptable level of property loss and business interruption insurance.

(Emphasis added.)

41.     Also on April 28, 2020, Defendants Escribano and Park signed and filed certifications of annual filings on Form 52-109FV1 on SEDAR.

42.     Also on April 28, 2020, Defendants Escribano, Park, Granath, and Dhanani signed and filed the report of management and directors on oil and gas disclosure on Form 51-101F3 on SEDAR.

43.     On April 30, 2020, the Company issued a press release entitled "ReconAfrica Provides Operations Update and Appoints Scot Evans, Former VP of Halliburton, as Chief Operating Officer" which stated the following regarding Defendant Evans' unconventional extraction experience and the Kavango Basin, in pertinent part:

> Mr. Scot Evans has been providing ReconAfrica with geological and international operations expertise since November, 2019. The Company is now pleased to announce the appointment of Mr. Evans as Chief Operating Officer. Mr. Evans is an energy industry leader with a combined 35 years of experience with Exxon and Halliburton. Most recently, Mr. Evans was Vice President of Halliburton's Integrated Asset Management and Technical Consulting organizations, where he grew production from 20K to over 100K barrels of oil equivalent per day, creating the equivalent of a MidCap upstream oil company. ***His experience in the US spans the Delaware, Midland, Eagle Ford and Monterey plays***, and internationally in Algeria, Kuwait, India, Angola, Ecuador and Mexico. He is an expert in developing new field resources.
>
> "I have been following ReconAfrica's technical advances for several years, and am truly excited to be part of such a strong technical and financial team. As a geologist, ***the opportunity to be part of the opening of a new sedimentary basin of this scale rarely presents itself***, and ***I intend to bring the technical and operational experience in both conventional and unconventional plays*** that I have gained during my career to the company and its investors" – Scot Evans.

(Emphasis added.)

44.     On June 25, 2020, the Company issued a press release entitled "ReconAfrica Appoints Mr. Nick Steinsberger as Senior Vice President, Drilling and Completions" which quoted Defendant Evans' stating the following regarding a newly-hired executive's unconventional extraction experience:

> "***Nick [Steinsberger] is the pioneer of 'slick water fracs', a technique which transformed the economics and productivity of the Barnett shale and is now utilized in all commercial shale plays worldwide***", stated Scot Evans, ReconAfrica's COO. "He is considered a world leader in completions and well

design, and *has supervised over 1500 well programs in North American conventional and unconventional plays*."

(Emphasis added.)

45.     On July 7, 2020, the Company issued a press release entitled "ReconAfrica Completes Technical Evaluation of the Conventional Structures Throughout the Entire Kavango Basin, Namibia & Botswana" which stated the following, in pertinent part, regarding the Company's objectives and the Kavango Basin:

> The primary objective of ReconAfrica's initial three well drilling program, scheduled for Q4 of 2020, is to confirm a thick, active, petroleum system throughout the deep Kavango basin. *Specifically, the wells are designed to test organic rich shales* and more shallow conventional structures throughout the sedimentary basin.
>
> With support of a new extended, high density Aero-Mag survey and Halliburton's advanced LithoTect® technology, and other new ancillary data, *the Company's technical team has generated a thorough understanding of how this deep Permian rift basin developed*. Specifically, the Company has been able to identify the faulting system throughout the basin, responsible for developing potential conventional fault and stratigraphic hydrocarbon bearing structures. *This work builds on the unconventional potential previously identified for Kavango Basin.*

(Emphasis added.)

46.     On July 27, 2020, the Company filed on SEDAR a new report by Sproule (the "2020 Sproule Report") which stated the following, in pertinent part regarding unconventional extraction:

> This report includes estimates of the prospective resources in Namibia (unchanged since the 2018 report), and the estimates of the prospective resources in Botswana on the Company's land. In addition, combined prospective resources within both the Namibia and Botswana licences are also presented in this report. *The undiscovered PIIP [Petroleum Initially-in-Place] and prospective resources included in this report represent the unconventional (tight gas, shale gas and tight oil) resources on the Company's lands and do not include potential conventional prospective resources.* There could be additional potential conventional hydrocarbon accumulations on Company lands that will be better defined after drilling one or several wells on the Company lands.

*         *         *

14

**Geological Evaluation**

As was mentioned above, the prospective resource estimates are mostly based on the work conducted by Sproule in 2018, details of which are described below. In addition, for this report, Sproule completed an estimate of the prospective resources within the Company's land in Botswana. Since the lands in Botswana are a continuation of the same Kavango Basin, Sproule used the same methodology and reservoir parameters (except area distribution) as for the Namibia lands for estimation of the prospective resources in Botswana. ***The undiscovered PIIP and prospective resources included in this report represent the unconventional (tight gas, shale gas and tight oil) resources on the Company's lands and do not include potential conventional prospective resources.*** There could be additional potential conventional hydrocarbon accumulations on Company lands that will be better defined after drilling one or several wells on the Company lands.

*     *     *

**Geology Review Summary**

***The Company is targeting equivalent rocks to the hydrocarbon-prone unconventional deposits within the Karoo Group of the Main Karoo Basin in South Africa.*** The main producing formations within the Main Karoo Basin are the Prince Albert, Whitehill and Collingham, all of the Lower Ecca Group.

*     *     *

Formation Volume Factor

***To estimate the formation volume factor for oil (Bo), Sproule used the data for unconventional plays in North America summarized in the EIA/ARI World Shale Gas and Shale Oil Resource Assessment*** (May 17, 2013). Different formations with normal or slightly over-pressured reservoirs (Barnett, Wolfcamp, Niobrara) were reviewed for their Bo value. As a result, the range of Bo between 1.1 and 1.5 was used for the distribution.

*     *     *

2.4 Unconventional Resources

2.4.0.1 The types of in-place petroleum resources defined as conventional and unconventional may require different evaluation approaches and/or extraction methods. However, the PRMS resources definitions, together with the classification system, apply to all types of petroleum accumulations regardless of the in-place characteristics, extraction method applied, or degree of processing required.

*     *     *

B. Unconventional resources exist in petroleum accumulations that are pervasive throughout a large area and are not significantly affected by hydrodynamic influences (also called "continuous-type deposit"). Usually there is not an obvious structural or stratigraphic trap. Examples include coalbed methane (CBM), basin-centered gas (low permeability), tight gas and tight oil (low permeability), gas

15

hydrates, natural bitumen (very high viscosity oil), and oil shale (kerogen) deposits. Note that shale gas and shale oil are sub-types of tight gas and tight oil where the lithologies are predominantly shales or siltstones. These accumulations lack the porosity and permeability of conventional reservoirs required to flow without stimulation at economic rates. Typically, such accumulations require specialized extraction technology (e.g., dewatering of CBM, hydraulic fracturing stimulation for tight gas and tight oil, steam and/or solvents to mobilize natural bitumen for in-situ recovery, and in some cases, surface mining of oil sands). Moreover, the extracted petroleum may require significant processing before sales (e.g., bitumen upgraders).

(Emphasis added.) (Internal footnotes omitted.)

47.     On July 28, 2020, the Company filed on SEDAR its Annual Information for the Financial Year Ended December 31, 2019 (the "2019 Annual Report") which stated the following, in pertinent part, regarding unconventional extraction:

*Geology Description*
**The Company is targeting equivalent rocks to the hydrocarbon-prone unconventional deposits within the Karoo Group of the Main Karoo Basin in South Africa.** The main producing formations within the Main Karoo Basin are the Prince Albert, Whitehill and Collingham, and all of the Lower Ecca Group.

\*       \*       \*

**The undiscovered petroleum initially-in-place and prospective resources included in the Sproule Report represent the unconventional (tight gas, shale gas and tight oil) resources of the Company's lands and do not include potential conventional prospective resources.**

\*       \*       \*

*Formation Volume Factor*
**To estimate the formation volume factor for oil ("Bo"), Sproule used the data for unconventional plays in North America** summarized in the EIA/ARI World Shale Gas and Shale Oil Resource Assessment (May 17, 2013).

\*       \*       \*

The Company's initial work program is designed to confirm the presence of an active petroleum system in the Kavango Basin. **Depending on the success of the initial work program, the Company anticipates it will begin further exploration and development of conventional and unconventional hydrocarbons in commercial quantities or seek potential partnering opportunities to assist in its exploration and development of conventional and unconventional hydrocarbons in the Kavango Basin.**

\*      \*      \*

**Scot Evans**: *Chief Operating Officer*
... ***Mr. Evans' experience in the US extends to the Delaware, Midland, Eagle Ford and Monterey plays***, and internationally in Algeria, Kuwait, India, Russia, Ecuador and Mexico. ***He is an expert in developing unconventional resources.***
**Nick Steinsberger**: *Senior Vice President, Drilling and Completions*

... Mr. Steinsberger was promoted to Completion Manager for the Barnett Shale (Texas) in 1995. and ***was responsible for the first slickwater stimulation in the Barnett Shale in 1997, what is referred to as the first modern shale frac***. ... Nick is currently developing other resource plays in Oklahoma and Texas with ValPoint and ***working with ReconAfrica on their Namibia Licence to drill and test their block for conventional and unconventional targets***. Mr. Steinsberger has been the chief operating officer of ValPoint Operating, LLC and the drilling and completions engineer of Renaissance Oil Corp. since June 2012 and September 2015, respectively. ... ***Mr. Steinsberger has authored many technical papers on completion techniques in shales and has been written about in several, the most well-known being "The Frackers".***

\*      \*      \*

**Daniel Jarvie**: *Geochemist*
Mr. Jarvie is globally recognized as a leading analytical and interpretive organic geochemist, ***having evaluated conventional and unconventional petroleum systems around the World***. Most notably, he completed the geochemical analysis for Mitchell Energy, in their development of the Barnett Shale of the Fort Worth Basin, in Texas. ... Mr. Jarvie is the retired Chief Geochemist for EOG Resources, Inc., the largest producer of shale oil resource plays in North America. ***He is the President of Worldwide Geochemistry, LLC, working as a consultant to industry, focused on unconventional shale resource plays and prospects, and has also established a research lab to evaluate various aspects of unconventional shale-gas and shale-oil petroleum systems as well as conventional petroleum systems.***

(Emphasis added.)

48.     The 2019 Annual Report stated the following, in pertinent part, regarding the

Company's social, legal, and environmental obligations and practices:

Effective March 1, 2020, the Company adopted an Environmental, Health & Safety Policy (the "EHS Policy"). The purpose of the EHS Policy is to assist the Company in accomplishing its goal of preventing all injuries and protecting human life and the environment throughout all locations where the Company operates by specifying uniform, minimum safety rules and standards applicable in all areas of the Company's operations. To accomplish this objective, pursuant to the EHS Policy, the Company will, among other things, (i) advise each manager, supervisor

and employee of all applicable safety, health and environmental requirements, (ii) design and manage operations to minimize environmental and human health impacts; (iii) *comply with all laws and regulations governing safety, health and environmental protection*; (iv) *monitor, evaluate and report the Company's performance in safety, health and environmental protection*; and (v) *provide training necessary to protect human, environmental and physical resources*. The EHS Policy establishes the responsibilities of managers, supervisors, employees *and contractors as they relate to health, safety and environmental matters*, including requirements to report any injuries or unsafe working conditions, and provides rules for safety and the use of personal protective equipment at the Company's operations.

(Emphasis added.)

49.   Also on July 28, 2020, Defendants Escribano and Park signed and filed certifications of annual filings on Form 52-109FV1 on SEDAR.

50.   On August 4, 2020, the Company filed on SEDAR an investor presentation (the "August 2020 Investor Presentation"), which stated the following, in pertinent part, regarding the Company's unconventional extraction interest:

8.75 MM acre conventional and unconventional play

▪ Areally comparable to the Eagle Ford

51.   The statements referenced in ¶¶ 32-50 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) ReconAfrica's plan for using unconventional means for energy extraction (including fracking) in the fragile Kavango area; (2) that ReconAfrica would begin unlicensed drilling tests; (3) that ReconAfrica would illegally use water for well testing; (4) that ReconAfrica would illegally store used water in unlined pools; (5) that ReconAfrica would skirt Namibian law and hire an inadequate and inappropriate consultant; (6) that, as a result, ReconAfrica risked future well, drilling, and water-related licenses in Namibia

and Botswana; (7) that, as opposed to its representations, ReconAfrica did not reach out nor provide adequate information (including in relevant local languages) through accessible means to those to be impacted by its testing and potential energy extraction; (8) that ReconAfrica's interests are in the Owambo Basin, not the so-called Kavango Basin; (9) that ReconAfrica has continuously engaged in stock pumping; and (10) as a result of the foregoing, Defendants' public statements were materially false and/or misleading at all relevant times.

### The Truth Begins to Emerge

52.     On October 28, 2020, *National Geographic* published an article entitled "Oil rilling, possible fracking planned for Okavango region—elephants' last stronghold" which reported the following, in relevant part, regarding the Company's social, legal, and environmental obligations and practices and its unconventional extraction interests:

> Conservationists and community leaders in the spectacular Okavango wilderness region of Namibia and Botswana are raising alarms over oil and gas exploration and potential production that they fear would threaten the water resources of thousands of people and endangered wildlife.

> ReconAfrica, a petroleum exploration company headquartered in Canada, has licensed more than 13,600 square miles of land in the two countries. The home page of the company's website says its intention is to open "a new, deep sedimentary basin"—in other words, a new oil and gas field. The Kavango Basin, as the area is known to geologists, is larger than the country of Belgium, and ReconAfrica says it could hold up to 31 billion barrels of crude oil—more than the United States would use in four years if consumption remained the same as in 2019. It's possibly the world's "largest oil play of the decade," Oilprice.com, an energy news site, said in September.

> ... ***Experts who have reviewed the Namibian environmental impact assessment for the test wells point to serious problems in the way it was carried out.*** Meanwhile, approval for a drilling permit in the licensed area in Botswana is under way.

> ***If ReconAfrica finds oil, a February investor presentation says, then the ultimate goal is to drill "hundreds of wells" in the area and open at least some of them using "modern frac stimulations," a reference to fracking, the controversial***

*practice where underground shale is injected with high-pressure fluid to crack open the rock and release oil and gas.*

The threat from oil drilling to one of the planet's most diverse ecosystems and to more than 200,000 people who live in this desert region "boggles the mind," said Willem Odendaal, the former land, environment, and development project coordinator at Namibia's Legal Assistance Centre, a public interest law firm based in the capital, Windhoek. ***ReconAfrica's drilling areas overlap with a multicountry conservation park, six locally managed wildlife reserves, and one UNESCO World Heritage site (and could affect another, the Okavango Delta, nearby). The Okavango region is home to the largest herd of African elephants left on Earth and myriad other animals—African wild dogs, lions, leopards, giraffes, amphibians and reptiles, birds—and rare flora.***

Oil and gas infrastructure involves "the construction of roads, pipelines, and buildings" that "could all negatively affect important animal habitat, migratory pathways, and biodiversity," according to the World Wildlife Fund. ***Fracking in particular is of ecological concern because it requires large amounts of water and has been known to cause earthquakes, pollute water, release greenhouse gases, and lead to cancers and birth defects, among other problems.*** Physicians for Social Responsibility, a nonprofit U.S. organization working for a cleaner environment, reports that fracking for oil and gas can be disastrous for wildlife because it can poison the food chain, destroy habitat, and cause mass die-offs of fish and other aquatic species. ***Nonetheless, the process is often used in shale formations containing hydrocarbons because it's an effective way to wring more oil and gas from rocks.***

In response to questions from National Geographic about potential harm from drilling, ReconAfrica's spokesperson Claire Preece said, "***ReconAfrica will ensure that there is no environmental impact from these wells.*** Specific steps are taken that are part of our plans and verified by environmental auditors and technical specialists. ***ReconAfrica follows Namibian regulations and policies as well as international best practices.***"

***Odendaal said the Kavango Basin license has come as a surprise to many people who would have expected to be aware of it. "I didn't know about this," he said, "nor saw this coming."***

***Even many who live in the affected region were unaware. "I didn't know there is some company that will come to drill the oil,"*** said Jacob Hamutenya, chairperson of George Mukoya Conservancy, which is about 50 miles from one of the test well sites. The conservancy makes money through sustainable hunting and as a destination for wildlife-watching visitors.

\*      \*      \*

20

**Life-giving water**

Emerging on the edge of the Kalahari Desert, water shimmers like a mirage in the Okavango Delta. This approximately 7,000-square-mile wetland lies east and southeast of ReconAfrica's licensed area. *It's one of the largest inland deltas in the world—a virtually pristine wilderness* where antelope splash through grassy floodplains, zebras emerge from mopane woodlands, and elephants plod across shallow channels. More than two trillion gallons of water flow in each year to create a shifting, verdant patchwork of islands, channels, and lagoons.

\*        \*        \*

*This desert oasis is so extraordinary—and fragile—that in 2014, UNESCO added it to its list of World Heritage sites. The delta is also sheltered by Ramsar, an international treaty to protect wetlands whose signatories include Namibia and Botswana. The Okavango Delta is recognized by an act of the U.S. Congress and various other treaties.*

Most of the delta's water originates as seasonal rain in Angola's forested central highlands, flows into the Okavango River, and snakes in a three-month journey across the Caprivi Strip before spreading out like a many-fingered hand in the northwestern corner of Botswana. *ReconAfrica's licensed exploration area abuts the main river that feeds the Okavango Delta for some 170 miles. Few other water sources are available during the long dry season here.*

At present, few fences section off the Okavango wilderness, so as the waters return every year, eland scatter into surrounding areas to find good fodder, and as the antelope disperse, predators—including packs of wild dogs, prides of lions, and solitary leopards and cheetahs—follow them. *Wild animals use the entire region, which is why Angola, Botswana, Namibia, Zambia, and Zimbabwe have created the Kavango-Zambezi Transfrontier Conservation Area, or KAZA for short. Bigger than Italy, it's the largest conservation area on the continent. ReconAfrica's licensed areas overlap with this huge international park.*

*ReconAfrica's prospecting and exploration license in Botswana also encompasses the Tsodilo Hills, a World Heritage site that UNESCO has called the "Louvre of the desert"—a repository for more than 4,500 rock paintings, some dating back 1,200 years, created by the Indigenous San.* San people from the Khwe and Ju/'hoansi communities in Namibia and Botswana revere this sacred place.

\*        \*        \*

**Mixed messages**

Some facts about ReconAfrica's project remain murky, but important details are coming to light. *Multiple statements by ReconAfrica officials, as well as technical studies such as the company's May 2020 Kavango Basin Research Report and*

*investor presentations, reinforce the probability that exploration would involve fracking. Members of ReconAfrica's Kavango Basin senior team include fracking experts. Scot Evans, ReconAfrica's CEO, is a former Halliburton vice president with decades of technical and operational experience fracking shale oil in the U.S., and Nick Steinsberger, the senior vice president for drilling and completions, is often referred to as one of the fathers of fracking for his promotion of the use of high-pressure water mixed with chemicals to crack open the rocks.*

*In a February 2020 financial investment podcast interview, Evans said, "We think this unconventional play has a really high chance of success." In standard industry parlance, "unconventional" signals that "a combination of horizontal drilling and hydraulic fracturing" is often needed.*

*ReconAfrica spokesperson Claire Preece noted that "fracking is an oil or gas production method in unconventional reservoirs" in her October 21 reply to questions from National Geographic.* At the same time, she reiterated that fracking isn't applicable to ReconAfrica's exploration license and insisted that the company was focused on "hydrocarbons in conventional reservoirs" that don't need to be fracked.

The Namibian government says it has not given permission for ReconAfrica to frack. It says that ReconAfrica has a permit to drill two initial test wells but that no onshore oil production license has been granted.

Yet in the "operations section" of ReconAfrica's website, the company says it's entitled to a 25-year production license. Although ReconAfrica says that fracking is not part of its exploratory drilling plan, the company's investor presentation says that the vision, if oil is found, is to open a huge new oil and gas field, which likely would involve fracking. Spokesperson Claire Preece, however, told National Geographic the company intends to focus on oil from conventional reservoirs, which don't require fracking.

*       *       *

**Impact assessment violations**

...The experts pointed to the lack of physical assessments of fauna and flora and to the possible effects on local communities and other people, on archaeological sites, and on groundwater and surface water. They said that the assessment, consisting only of desktop studies without any fieldwork, is not sufficient to justify the proposed drilling. (The studies and other documents were not made available to National Geographic by either the government or the company, despite requests.)

*Namibian law provides for a powerful environmental safeguard, which allows any person, organization, or agency to be an active part of the review process for projects such as this by becoming registered as "interested and affected parties."* The environmental assessment practitioner maintains this register, must share it

with any person who requests it, and ***must keep registered parties informed as the review proceeds***.

***Mwiya did not provide the register***, and he said that the review process he was responsible for—the test wells—was already complete. Calling himself "just a consultant," he wrote: ***"The fact of the matter is I did not publish any advertisement as required by law requesting the public and stakeholders to register for this specific license and as such I am not so sure on what grounds you want to be registered."*** (It is unclear what he's referring to, as two notices were published in Namibian newspapers.)

Mwiya, who said that if his company is hired for the next stage of development— underground seismic surveys to confirm oil and gas deposits—they will publish public notices and invite stakeholders to register as interested and affected parties.

***Namibia's Environmental Management Act stipulates that an assessment be done "in an objective manner."*** Throughout the EIA, Mwiya highlights the benefits of the project, and he encouraged the government to approve it.

ReconAfrica's assessment "does not meet with the standards of comprehensive unbiased and scientific investigation required," said Jan Arkert, a consulting engineering geologist who's based in Uniondale, South Africa, and has worked for decades on drilling-related projects.

"It is shocking that this EIA was authorized at all," said Avena Jacklin, a former environmental consultant in the mining sector. She confirmed that the assessment didn't include interested and affected parties and "left out key assessments and specialist studies ... and has not identified alternatives" to oil and gas extraction, such as solar and wind power. "None of this has been laid out in the EIA."

***Arkert said the pits to store drilling mud and water described in the assessment are so big that ReconAfrica's plans for its test wells already may include fracking and may not have been fully disclosed to the Namibian government.*** (ReconAfrica denies that it plans to use fracking during the exploratory phase, and the Namibian government did not respond to questions about potential fracking plans.)

Whatever ReconAfrica's intentions, its test wells will require large quantities of water. They'll also produce large volumes of "cuttings"—polluted rock removed from the drill hole. ReconAfrica's assessment says the source for the water will be the Omatako River, which flows underground most of the time. ***Jacklin and Arkert, two of the independent experts who reviewed the environmental impact assessment for National Geographic, said details about water needs for the test wells, which should be addressed, are neglected in the EIA.*** That includes the volumes of water needed, the number of boreholes, where the water will be taken from the Omatako, how the extraction of water could affect nearby water wells or surrounding communities, and the disposal and treatment of wastewater from drilling.

\*       \*       \*

*In response to questions about other environmental effects of test wells, Preece said, "Drilling fluids will be reused" and "disposed of safely off-site," and cuttings "will be managed in lined pits, cleaned, and disposed of off-site," according to company and regulatory requirements.*

**Implications for communities and wildlife**

"People in the area get their water from hand-dug wells and small handpumps, Arkert said. "What happens if the company drops the groundwater table and people who live there can no longer access the water they have relied upon for generations?"

\*       \*       \*

*According to the International Union for Conservation of Nature (IUCN), the organization that keeps a record of Earth's dwindling species, ReconAfrica's license encompasses the territories of seven endangered animal species*, among them the gray crowned crane and the African wild dog, *and four critically endangered animals*, including the black rhinoceros and white-backed vulture. *It's also home to 20 other species listed as "vulnerable,"* including Temminck's pangolin and the martial eagle.

ReconAfrica's environmental impact assessment calls the potential significant effects of oil and gas drilling on fauna and flora in the prospecting area "negligible."

*According to ReconAfrica's Preece, "The area of interest named Kavango Basin is not situated in a sensitive area at all and all the exploration activities are highly localized."*

Rosie Woodroffe, coordinator of the African Wild Dog Working Group with the IUCN, said there are more African wild dogs around the ReconAfrica-licensed region than anywhere else in the world. "Wild dogs are highly sensitive to habitat loss," she said, "and any development within wild dog range which destroys, degrades, or fragments habitat is likely to be detrimental."

Extracting and transporting oil and gas ... cuts across animal migration routes. New roads also facilitate animal poaching by providing easy access to wild places. An influx of oil workers in central Africa spurred unsustainable demand for the wild meat of animals such as duikers and buffalo and increased poaching for high-value species – elephants, primates, lions. Even after drilling stops and workers leave, poaching can persist.

Noise too can be disruptive. The Elephant Listening Project found that forest elephants in central Africa switched to a more nocturnal lifestyle as a result of noise from oil exploration and development. Similarly, the American Ornithological

Society published a report in 2018 showing that competing noise from oil development caused birds in Alberta, Canada, to change their songs.

*"Studies show that there are multiple pathways to wildlife being harmed,"* biologist and author Sandra Steingraber, who has long studied risks from fracking, told the Revelator last year. "Biodiversity is a determinant of public health—without these wild animals doing ecosystem services for us, we can't survive." Elephants, for example, fertilize and seed trees with their dung and excavate the ground, opening up water sources for other animals.

*Oil development "is a threat to our livelihood," [Diphetogo Anita] Lekgowa [an Indigenous leader from the small settlement of Khwai in the Okavango Delta] said. "We drink from the river because we live far from the town, and we don't have treated water, but if these people come with a system that will damage the water, this is life-threatening to us."*

(Emphasis added.)

53.     On this news, ReconAfrica's shares fell 6% on October 28, 2020.

54.     On January 28, 2021, *National Geographic* published an article entitled "Test drilling for oil and gas begins in Namibia's Okavango region" which reported the following, in pertinent part, regarding the Company's social, legal, and environmental obligations and practices, and unconventional extraction interests:

*The Namibian government has not granted permission to frack, but a ReconAfrica research report and podcast interview given by CEO Scot Evans discuss "unconventional opportunities," and a company investor presentation refers to the possibility of using "modern frac simulations" (fracking), if exploratory drilling proves promising.*

*ReconAfrica did not respond to questions or requests for comment for this report, but instead sent a letter from a Namibian attorney threatening legal action against National Geographic if its previous story was not amended or retracted.*

**Test drilling begins**

Drilling in the Omatako River, the site of the first test well, is risky for local communities, says Surina Esterhuyse, a geohydrologist from South Africa's University of the Free State, in Bloemfontein. Surface water is hard to find in this arid region, so people rely on groundwater, which can easily be contaminated when the water table is shallow, as it is here.

25

*Preece told National Geographic in October 2020 that the company plans to dig new water wells for communities near drill sites and that potentially toxic drill cuttings from the oil test wells "will be managed in lined pits, cleaned, and disposed of offsite as per company and regulatory requirements."*

\*      \*      \*

Preece said that the test drill area "is not situated in a sensitive area at all and all the exploration activities are highly localised." *She further noted that "ReconAfrica follows Namibian regulations and policies as well as international best practices."*

**Elephant rumblings**

In addition to drilling test wells, ReconAfrica said in an October 2020 news release that it plans to undertake a seismic survey in early 2021 to confirm the presence and size of oil and gas deposits. Seismic surveys send sound waves into the Earth that, like x-rays in a human body, provide a rough picture thousands of feet below the surface. To create the waves, specialized trucks thump the ground with powerful, low-frequency vibrations.

Before ReconAfrica can begin the seismic survey, it must carry out an environmental impact assessment, according to Namibian law, as it had to do to get permission to drill test wells.

Namibian environmental assessment practitioner Sindila Mwiya—who completed the analysis, in June 2019, for the test well phase of the project—is undertaking the new assessment for the seismic survey. On January 7, he published a notice in the Namibian press inviting public consultations in writing or at scheduled in-person meetings.

*Recon Africa's map of the planned seismic survey shows that part of it will run along the entire western border of the George Mukoya Conservancy. Jacob Hamutenya is the conservancy's chairman. He says he had heard nothing about the seismic testing plan and fears for his community and the elephants that attract tourists to his area.*

*"It is not good for us to not hear anything about this program of testing; that is totally unfair," Hamutenya says. He's concerned that ReconAfrica's seismic survey may harm "our environment, our wildlife and our trees, even our domestic animals."*

Mwiya's previous environmental impact assessment, for ReconAfrica's test drilling, noted that it would be done in an elephant migration corridor between two national parks, which is also where the company plans to carry out its seismic survey. ...

Biologists are concerned about how the seismic survey's sound waves will affect elephants, which communicate with low-frequency seismic waves "heard" through their sensitive feet. These vibrations provide information about other herds, water sources, and potential danger.

"Recent studies have demonstrated that elephants were sensitive to seismic signals produced by thunderstorms a hundred miles away," says elephant biologist Audrey Delsink, the wildlife director of Humane Society International, in Africa. "So we know that elephants are extremely sensitive to, and primed for, seismic vibrations."

ReconAfrica did not respond to a request from National Geographic as to whether the environmental impact assessment would include information on the effects on elephants of seismic testing in the area.

*        *        *

*Part of the anger many Namibians hold stems from the sense, they say, that they were left out of the initial environmental assessment process*, which paved the way for ReconAfrica to get a permit to drill test wells.

When reached for comment, Pate (whose real name is Veruschka Dumeni) said, *"We only heard about this project in September [2020] in the press."* Dumeni said it was frustrating because, she claims, "only when the commencement of the project was near, when the company had raised financing, built investor interest, and already obtained the rights, only then did the nation and affected communities come to know of it."

Mwiya's company, Risk-Based Solutions, held public meetings in March and May 2019, and public notices in English ran in local media in May 2019 inviting written feedback on the plans to drill test wells by the end of the month. *Although English is the country's official language, most Namibians don't speak or understand it. An email address and phone number were provided, but some 85 percent of the people living in the license area don't use the internet regularly or have no online access to enable them to submit written feedback, as the notice requested.*

(Emphasis added.)

55.    On this news, ReconAfrica's shares fell 7% on January 28, 2021.

56.    On March 8, 2021, Maggy Shino, the Petroleum Commissioner in the Namibian Ministry of Mines and Energy issued a media release entitled "RECONNAISANCE ENERGY OPERATIONS IN NAMIBIA" which stated, in pertinent part, regarding the Company's unconventional extraction interest:

***We can confirm to the nation that no license to conduct fracking activities was granted to Reconnaissance Energy by the Ministry and no such license is being contemplated.***

\*       \*       \*

Once there is success during the exploration phase in a form of a commercial discovery, a production licence will be entered into following negotiations of the field development plan which will form the basis of the production licence terms and conditions.

***The Ministry is working closely with Reconnaissance Energy and the Ministry of Environment and Tourism to ensure that the current drilling and future operations are performed in an environmentally sound manner.***

We are well aware of the value and wealth that our country is endowed with both on the surface and subsurface. It is our objective as a Ministry to regulate the exploration and exploitation of our country's natural resources in an environmental sustainable manner and utilize an evidence-based approach when making decisions to formulate policies.

(Emphasis added.)

57.    On this news, ReconAfrica's shares fell 7% on March 9, 2021.

58.    On April 7, 2021, the Company issued a press release entitled "ReconAfrica Operational and Corporate Update, Namibia" which stated the following, in pertinent part, regarding the Company's social, legal, and environmental obligations and practices and its unconventional extraction interests:

Of critical importance to the region, ReconAfrica has permitted and drilled four community water wells which are fully operational and is permitting an additional six locations in both East and West Kavango. These wells are in addition to the two wellsite water wells, that have been drilled to support operations, and will be available for use by the local communities when appropriate. ***As access to fresh water is a major daily challenge for many residents in the Kavango Region***, drilling and completing wells, for those who need it the most, is a significant component of ReconAfrica's community outreach program in this impoverished region.

Please see the second of its series 'The Voices of Kavango', available to view here - (Chapter 2). This video highlights the stakeholder engagement in various communities in which ReconAfrica operates along with some specific examples of local hiring in the region and communities.

28

\*       \*       \*

Also, joining the Company is Geoff Anderson, a petroleum geologist with over 17 years of experience in exploration and development geology, and petroleum economics. He has an MBA in Energy Leadership and is skilled in economic evaluation modeling and project development. Geoff started his career at BlackRock Ventures Inc. which was sold to Shell Canada for $2.4 Billion CAD in 2006. ***He also held a geologist role at North American Oil Sands Corporation*** that was sold to StatOil for $2.2 Billion CAD in 2007. His most recent role was as Senior Geologist and Economic Modeler with Prosper Petroleum Ltd. based in Calgary, Alberta.

(Emphasis added.)

59.     On April 20, 2021, the Company filed on SEDAR on Form 51-102F1 its Management Discussion and Analysis for the Year Ended December 31, 2020, which stated the following, in pertinent part, regarding its social, legal, and environmental obligations and practices:

ReconAfrica's Corporate Social Responsibility ("CSR") policy, developed in 2020, is designed to ensure we conduct our business activities responsibly and to align with the expectations of communities, governments, and other stakeholders. Our environmental, social and governance ("ESG") criteria provide a basis for measuring our performance against the highest global standards. ReconAfrica's Environmental, Health & Safety goals include the following: zero accidents/incidents, ***no harm to people*** and ***no damage to the environment***.

ReconAfrica is committed to protecting the environment, ***avoiding environmentally sensitive areas***, minimizing disturbances, and implementing best practices according to international standards. ***We have conducted comprehensive Environmental Impact Assessments ("EIA") to fully understand and protect the Kavango East and West regions, under the strict and fully developed Namibian regulatory regime inclusive of legal, regulatory standards, policies and practices.*** We have our Environmental Clearance Certificate for Stratigraphic Wells and we have completed our initial background work for the 2D Seismic EIA and are in the review process stage.

We respect the integrity of all designated protected and environmentally sensitive areas, such as the Tsodilo Hills in Botswana; we have a collaborative agreement with the Republic of Botswana that excludes the Tsodilo Hills from the company's license area and we will respect all exclusionary areas. ***ReconAfrica is not currently drilling and has no plans for any operations anywhere near sensitive waterbodies or the Okavango Delta***....

ReconAfrica is implementing industry leading drilling practices to protect the environment, both above and below the surface. ***We are avoiding ecologically sensitive and national preserve areas, and working collaboratively with national, regional and local governments***, using our drilling expertise to provide potable water from the region's considerable aquifer systems. ***When drilling, ReconAfrica protects the well with one of the most important components in the drilling process – casing. The multiple layers of cement and steel casing provide the foundation of the well, sealing it to prevent any fluids from escaping.*** Additionally, our wells are drilled with organic and biodegradable water-based drilling fluids. ***We implement these measures to ensure complete protection of all water sources and aquifers.*** The system is also used as a soil enhancement/fertilizer by farmers and the agricultural industry around the world, as the mud will biodegrade, ***yielding no toxic or damaging by-product***.

Our water-management plan includes groundwater assessments, hydro census, monitoring, and mitigation. We are working collaboratively with representatives from the Ministry of Agriculture, Water and Land Reform ("MAWLR"), NamWater, Regional Authorities, ***Traditional Authorities, and other experts and interested stakeholders to protect Namibia's water***. The water-management program has three key objectives: aquifer protection; surface water and drainage management; and sustained protection of project no-go zones.

***ReconAfrica completes various consultation and engagement with their impacted and interested stakeholders including***: regulatory consultation, community engagement – more formal and in community meetings, cluster community engagement – interactive group session and one-on-one family/concession sessions, proactive clarification engagement, government engagement – regional and national, Traditional Authorities and Community Headmen and Headwomen ***engagement which are all translated into the local stakeholders' languages***. ***We also work alongside regional, elected, and national authorities to keep them updated.*** ReconAfrica's CSR team was invited by the San (Kwe) leaders to participate in extensive engagement, during which we provided translated project information in their indigenous language. Among the participants in these sessions were the Traditional Chief, Senior Headmen, Traditional Councillors and community members. ***ReconAfrica recognizes the importance of free, prior and informed consent.***

\*    \*    \*

***We are committed to sustainable development and employ industry best practices wherever it operates to protect the environment, including policies and protocols to support wildlife conservation efforts in Namibia and Botswana.*** We have a wildlife survey and environmental specialist as part of our ESG team along with the extensive measures found within our EIAs to demonstrate the actions we take with respect to protection of wildlife. ReconAfrica is working closely with businesses, tourism, government authorities, multi-national conservation groups to for the protection of wildlife.

(Emphasis added.)

60.     Also on April 20, 2021, Defendants Escribano and Evans signed and filed certifications of annual filings on Form 52-109FV1 on SEDAR.

61.     Also on April 20, 2021, Defendants Escribano, Park, Granath, Evans and Gerlitz signed and filed the report of management and directors on oil and gas disclosure on Form 51-101F3 on SEDAR.

62.     On April 22, 2021, *Yale Environment 360* published an article entitled "A Big Oil Project in Africa" which reported the following, in relevant part, regarding the Company's social, legal, and environmental obligations and practices, and unconventional extraction experience:

> A Canadian company is drilling exploratory wells in Namibia for what could be a major oil and gas find. ***Local residents and conservationists fear the project could use up scarce water supplies and cause widespread ecological disruption downstream in the world-renowned Okavango Delta.***
>
> \*     \*     \*
>
> The family has no idea if they will have to leave their home and, if so, whether they will be compensated. ***They're also angry that they were not consulted, and skeptical that they will benefit from permanent jobs despite having to live with the test well on their doorstep.***
>
> The rig belongs to ReconAfrica, an oil and gas company headquartered in Canada, currently drilling three test wells in the sedimentary Kavango Basin of Namibia. The company has a license for an area of 9,800 square miles, plus an adjacent area in neighboring Botswana — 13,250 square miles in total. According to a 2019 investor presentation obtained by *National Geographic,* the company's goal is to drill hundreds of wells under a 25-year production license. Geochemist and ReconAfrica shareholder Daniel Jarvie estimated the basin has the potential to produce as much as 120 billion barrels of oil equivalent, which would make it one of the biggest global oil finds in recent years.
>
> But ReconAfrica's plans are touching off mounting questions and opposition. The regions of Kavango East and Kavango West are home to 200,000 people — including the indigenous San — making a living from farming, fishing, and tourism. A network of rigs, pipelines, and roads would sprawl across an environmentally sensitive, semi-arid region that is home to Africa's largest remaining population of savanna elephants as well as numerous threatened or endangered wildlife species. In addition, the drilling — which may involve

hydraulic fracturing, or fracking — also would encompass or border national parks and wildlife conservancies, and could threaten waterways that local communities rely on and that eventually flow into the renowned Okavango Delta, a UNESCO World Heritage Site.

... ***Despite the scale of the project, the development is shrouded in a cloak of ambiguity. Many Namibians, including environmentalists and even some in government, were surprised when ReconAfrica shipped an exploratory drilling rig to Namibia in late 2020.*** Though some local traditional leaders say they were consulted, that information often did not filter down to other community leaders or into many Kavango communities.

***"They felt that they were not involved, they were hearing over the radio, over social media, in the media about development on their lands," said Maxi Pia Louis, director of the Namibian Association of Community-Based Natural Resource Management Support Organizations (NACSO)***, which has been working with Kavango communities seeking guidance on how to ensure they will benefit from the proposed oil drilling. ***The Kavango is the poorest region of Namibia, with the unemployment rate reaching nearly 50 percent in Kavango East.***

The Kavango Basin, which spans northeastern Namibia and northwestern Botswana, is part of the Kalahari Desert. In an otherwise dry environment, the Okavango River (known in Namibia as the Kavango) is a lifeline, flowing from the highlands of Angola, through northern Namibia, and emptying out into the Okavango Delta, in northwest Botswana. ReconAfrica's license area is home to the Kavango people – five tribal groups who mostly make their living fishing, cattle herding, and farming pearl millet, maize, and sorghum.

The drilling area is also the homeland of the San — otherwise known as Bushmen — a group of many tribes who have historically been victims of genocide and who lost most of their land during the colonial era. Critics of the ReconAfrica development, including a group of Anglican bishops, have declared that the exploration "violates San rights under the UN Declaration on the Rights of Indigenous Peoples."

***"The process has not been an open one, with Namibians waking up to [an oil] venture that has already been signed and settled," the Bishop of Namibia, Reverend Luke Pato, said in a statement. "There are many questions to be answered."***

\*        \*        \*

Beyond short-term opportunities, the residents of Kavango worry about the state in which ReconAfrica will leave the region. ***The 2019 environmental impact assessment (EIA) commissioned by ReconAfrica was widely criticized for glossing over potential ecological problems. Experts cited, among other things,***

*the lack of specialist reports pertaining to flora and fauna* — for example, the impact of oil drilling on the plants that San communities use as medicine.

*    *    *

"ReconAfrica refuses to talk about the bigger picture – what the landscape would look like in the event of an oil find," Chris Brown, CEO of the Namibian Chamber of Environment — an industry-sponsored organization that works with environmental groups — said in an email. "They focus just on the immediate step. The public wants to know what the likely consequences would be of an oil find and the impacts to the Kavango regions and to the Okavango Basin. ReconAfrica refuses to discuss this."

A key concern is the impact on the region's water supplies. *Indeed, one of the first test wells was drilled close to the Omatako River, which is linked to the Kavango River and is about 150 miles from the Okavango Delta. A major question is whether ReconAfrica plans to frack for oil and gas, which has a history in the United States — where it is most widely used — of contaminating water and causing health issues. Previously, ReconAfrica CEO Scot Evans and the company have discussed unconventional drilling opportunities — a term often used to refer to fracking — in the Kavango.* But the Namibian government has said that no such license has been issued, and ReconAfrica has since scrubbed any "unconventional" mentions from its literature.

Given that water from the region flows into the Okavango delta, "any pollution would be harmful" to the Okavango Basin ecosystem as well as Kavango communities, says Brown. *ReconAfrica has compared the geological conditions in the Kavango to the Karoo Basin in South Africa — an area where fracking has begun for natural gas — and the company seems confident it has found a major petroleum play.* Recon Africa has a 90 percent stake in the Kavango development, the first of its kind in Namibia, while the Namibian government holds 10 percent.

*    *    *

*Perhaps of most immediate concern to local communities is ReconAfrica's opacity.* Max Muyemburuko is the chairperson of the Kavango East and West Regional Conservancy and Community Forestry Association. Although ReconAfrica's license area includes several wildlife conservancies, the first Muyemburuko heard of the development was last November. He said recent meetings have still not revealed anything about potential negative impacts and what ReconAfrica plans to do about them. (ReconAfrica did not responded to *Yale Environment 360*'s requests for comment, though a spokeswoman told *National Geographic* that "ReconAfrica will ensure that there is no environmental impact from these wells*.*")

33

> *Hamweyi village headman Mangundu Reinhardt — who also said he was not consulted or informed about ReconAfrica's plans — said that he'd heard few complaints because most people simply had no idea what was happening.*

*        *        *

> *Local leaders and residents have not been encouraged by the environmental assessment practitioner who wrote the EIA, Sindila Mwiya of Risk-Based Solutions. Numerous people have accused him of acting hostilely toward anyone questioning ReconAfrica's activities. After Muyemburuko emailed Mwiya some questions in January, Mwiya — who is supposed to be unbiased in his role — responded by labeling one question about the removal of trees as "stupidity and nonsense of the highest level" and accusing Muyemburuko of "Eurocentric and colonial thinking" in denying people the chance for jobs and regional development.*

(Emphasis added.)

63.     On this news, ReconAfrica's shares fell $0.95 per share, or 16%, on April 22, 2021.

64.     On April 29, 2021, the Company filed on SEDAR its Management Information Circular and Notice of Annual General and Special Meeting of Shareholders of Reconnaissance Energy Africa Ltd. that was to be held on June 8, 2021 which stated the following, in pertinent part, regarding the Company's unconventional extraction interests: "***There is no hydraulic fracturing or other stimulation in our drilling program, as the targets are conventional reservoirs.***"

65.     On April 30, 2021, the Company filed on SEDAR its Annual Information Form for the Financial Year Ended December 31, 2020 (the "2020 Annual Information Form") which stated the following, in pertinent part, regarding the Company's unconventional extraction interests and the Kavango Basin:

> *The undiscovered petroleum initially-in-place and prospective resources included in the Sproule Report represent the unconventional (tight gas, shale gas and tight oil) resources of the Company's lands and do not include potential conventional prospective resources.* There could be additional potential conventional hydrocarbon resources on the Company's lands that will be better defined after drilling one or several wells and with the planned acquisition of 2D seismic data.

34

*   *   *

**To estimate the formation volume factor for oil ("Bo"), Sproule used the data for unconventional plays in North America summarized in the EIA/ARI World Shale Gas and Shale Oil Resource Assessment** (May 17, 2013).

*   *   *

The below paleogeographic map illustrates the interpreted environment of deposition for the Permian Ecca formation (Karoo). It shows the area of Namibia Licence and Botswana Licence in a marine shallow to deep environment. **This indicates that the Kavango Basin may be continuous with the Permian unconventional formations of the Main Karoo Basin in South Africa.** While there is no direct comparison of resource magnitude at this time, the relevance of the comparison is to illustrate that the Permian formations in the Kavango basin are interpreted have been deposited in the same environment as those in the Karoo basin in South Africa, at approximately the same time.

[Image omitted.]

*   *   *

The Company's initial work program is designed to confirm the presence of an active petroleum system in the Kavango Basin. Depending on the success of the initial work program, **the Company anticipates it will begin further exploration and development of conventional and unconventional hydrocarbons in commercial quantities or seek potential partnering opportunities to assist in its exploration and development of conventional and unconventional hydrocarbons in the Kavango Basin**.

(Emphasis added.)

66.     The 2020 Annual Information Form stated the following, in pertinent part, regarding the Company's social, legal, and environmental obligations and practices:

**Consultation sessions regarding our seismic and stratigraphic programs were completed directly with communities.** ReconAfrica continues to engage interested and affected stakeholders on an ongoing basis. ReconAfrica reaches out to traditional authorities, community leaders and community members both in formal consultation community meetings and also in what are locally known as "cluster village interaction" sessions, **which are all translated into the local stakeholders' languages**.

(Emphasis added.)

67.     Also on April 30, 2021, Defendants Escribano and Evans signed and filed certifications of annual filings on Form 52-109FV1 on SEDAR.

68.     On May 11, 2021, *National Geographic* published an article entitled "Oil company exploring in sensitive elephant habitat accused of ignoring community concerns" which reported the following, in relevant part, regarding the Company's social, legal, and environmental obligations and practices:

> ReconAfrica, a Canadian company exploring for oil and gas in Namibia upstream of a world-famous UNESCO World Heritage site that's home to elephants and other wildlife ***is disposing of wastewater without permits, according to a government minister***. ***The company is also ignoring local concerns about the impact of exploration and drilling on water supplies, homes, and animals, according to interviews and official comments submitted by members of the public.***
>
> There was scant public awareness of ReconAfrica's plans to search for oil in this region of more than 200,000 people before *National Geographic* began reporting last October on the risks drilling could pose to water and wildlife.
>
> The company's 13,200 square-mile license area—about 70 percent of that in Namibia and the rest in Botswana—encompasses part of the vital watershed of the Okavango Delta. One of the largest inland deltas in the world, this fragile, 7,000-square-mile desert wetland lies in northwestern Botswana about 160 miles southeast of ReconAfrica's first test well. It attracts some 100,000 tourists to high-end lodges each year and holds such a spectacular diversity of wildlife and plants that in 2014 UNESCO added it to its list of World Heritage sites. The delta is home to lions, giraffes, antelopes, wild dogs, martial eagles. Botswana's 130,000 endangered savanna elephants-Africa's largest remaining population-roam its lush islands, where they depend on the 2.5 trillion gallons of water that flow in each year from the north and west.
>
> *                *                *
>
> And wringing oil from rocks deep underground requires massive quantities of water, which is already scarce in the region. ReconAfrica's license area abuts the main river that feeds the Okavango Delta for some 170 miles. Few other water sources are available for people and wildlife during the long dry season in this parched land.
>
> ***Drilling for the first test well began in January, and waste fluids are being stored in what appears to be an unlined pond, where they could leach into the ground***

36

*and contaminate the water supply in this desert region, National Geographic reported last month.*

*Calle Schlettwein, Namibia's minister of agriculture, water, and land reform, the agency responsible for water-related permits, told National Geographic in a written statement that ReconAfrica does not yet have permits approved to extract water to use in its drilling operations nor to dispose of the waste water, suggesting that the company is operating in breach of Namibian government regulations. In its 2019 environmental assessment, ReconAfrica said it would have all permits in place before work began.*

Asked about wastewater disposal, water extraction, and the ministry's assertion that ReconAfrica has not yet secured the proper permits, *spokesman Chris Gilmour, of Beattie Communications, a U.K.-based public relations firm hired by ReconAfrica, didn't answer directly, but said in an emailed statement that the company "has completed several required permits for its ongoing work and will continue to complete all drilling-related and other permit requirements."*

Beyond the dispute over permits and wastewater disposal, members of the public— both in interviews and in statements submitted officially to company representatives—say *ReconAfrica has not taken seriously the requirement to inform and consult the public about its plans*. That's both legally mandated and critical to ensure the voices of the people most likely to be affected by the project are heard, says Annette Huebschle, a Namibian-raised environmental social scientist and senior research fellow with the Global Risk Governance Programme at the University of Cape Town in South Africa.

It allows "people to judge for themselves whether oil and gas development is the kind of socio-economic development they are seeking for themselves and their children," she says. As has happened in Nigeria's Niger Delta, Ecuador, and elsewhere, corporations often "fail dismally in apprising Indigenous peoples and local communities about long-term impacts of resource extraction and the clean-up once extraction processes have been completed."

To guard against that, *Namibian law requires companies to ensure that members of the public are aware of the proposed project, fully understand it, and have a chance to raise concerns*. This can be achieved by newspaper ads, notices on community bulletin boards, and public meetings. *(ReconAfrica's newspaper notices were published in English, the official language, but most Namibians in rural communities affected by the project don't read or speak English.)* Numerous people and advocacy organizations have registered their concern with ReconAfrica representatives that the process has fallen short.

For example, pandemic travel restrictions and health concerns prevented some from attending public meetings, and at those meetings, the number of attendees was capped, says an official comment from Natural Justice, a human rights and environmental law nonprofit that supports Indigenous African communities.

Namibia's lack of broadband infrastructure, especially in the areas covered by ReconAfrica's exploration license, has also been a barrier to informing Indigenous and rural communities and giving them an opportunity to give feedback, others noted.

*Meanwhile, at public meetings, including a contentious hearing in Windhoek, company representatives sidestepped attendees' questions. The company also canceled other meetings in remote, rural communities without explanation.*

*Gilmour, ReconAfrica's spokesman, did not respond to questions about the public consultation process, notices, and meetings, but he said there have been "detailed consultation[s] with local communities and other stakeholders" and that ReconAfrica will "continue to keep an active and collaborative relationship in place with all interested parties."*

**Thumping the ground**

More recently, ReconAfrica has said it will begin seismic testing if it gets approval—another way to help confirm oil and gas deposits. This involves sending shock waves into the earth by thumping the ground with mobile equipment the manufacturer describes as "better than dynamite."

*Some worry that the vibrations could damage their water wells and mud and brick homes and say ReconAfrica isn't taking their concerns seriously.*

Before the company can begin a seismic survey, it needs to do an environmental assessment that evaluates, among other things, any problems the survey may cause. *By law in Namibia, oil and gas projects must solicit input from the public, and concerns raised must be addressed in the assessment's final report in order to get government approval.* On March 26, ReconAfrica released the thousand-plus-page draft of the assessment, prepared by Namibian consultant Sindila Mwiya's company, Risk-Based Solutions.

*Risk-Based Solutions also carried out a 2019 environmental assessment for ReconAfrica's test wells that was criticized as incomplete and lacking scientific rigor by environmental experts who reviewed it for* **National Geographic***. They lambasted it for—among other things—failing to include field assessments of animals and plants to measure possible effects on wildlife, local communities, archaeological sites, and water.*

ReconAfrica invited comment on the project during a public review period from January 7 through February 12, and a number of public meetings were held during that time. *Namibian journalist John Grobler said a meeting scheduled in Mbambi on January 23 never took place. The next day when he was traveling to a scheduled meeting in Ncamakora constituency, a ReconAfrica representative told him it had been canceled. But according to the draft assessment for the seismic survey, the Ncamakora meeting was held the day before at Mbambi, where,*

*Grobler says, about a hundred people were waiting for the opportunity to raise their concerns directly with ReconAfrica.*

*The company is either "confused, poorly organized, or being intentionally misguiding," Grobler says.*

ReconAfrica spokeswoman Claire Preece and Gilmour did not answer *National Geographic*'s questions about public meetings.

Max Muyemburuko, chairman of the Muduva Nyangana community-based wildlife conservancy, which lies within ReconAfrica's exploration area, says **the hearing he attended on January 22 in Rundu was so filled with jargon that "no one on the ground can understand the technical terms** that Recon is using. We just come from the meeting with no information at all. It is very upsetting."

*Muyemburuko calls the two-hour-long meeting "not a proper consultation," a concern echoed by many in comments submitted to Risk-Based Solutions. There were only 15 minutes left at the end for questions, "but...they ignored the community's questions, and they rushed it."*

Later that day, Muyemburuko sent Mwiya, the company's consultant, an email listing concerns about the seismic testing that he hadn't been able to ask at the meeting. Muyemburuko cited concerns about potential damage to homes, "many made from mud or light brick and concrete," close to the roads to be used for the seismic survey. More than a hundred are along the survey lines, satellite imagery on Google Earth shows.

Mwiya's emailed response was dismissive.

*"You are just trying to seek some limelight out of nothing and out of a project that you absolutely do not understand at all," Mwiya wrote. "It is really sad to see this so low level of ignorant environmental advocacy that you are displaying." Mwiya went on: "Stupidity and nonsense of the highest level...what is wrong with you?"*

\*     \*     \*

**A contentious consultation**

*At the heated public meeting on February 2 in Windhoek, Mwiya and Preece sidestepped attendees' questions.*

*Asked about potential damage to homes and water wells from seismic thumper trucks, for example, Preece said the trucks are "not something that stays there," but didn't address the question asked.*

Preece and Mwiya emphasized that the project is a step-by-step process and that concerns will be addressed as it progresses. **Petroleum production is "far, far**

*away," Mwiya said. Trying to calm an audience that was growing increasingly frustrated, he said, "We don't even know that the [oil and gas] basin exists."*

*That comment contradicts the company's own statements and investor presentations.* ReconAfrica has described its license area in Namibia and Botswana to investors as "one of the largest onshore undeveloped hydrocarbon basins in the world."

\*       \*       \*

Mwiya did not respond to *National Geographic's* questions about the consultative process or accusations of bias and bullying.

*It's "very sad to see that people like you…who have zero experience or training in oil and gas exploration now want to be overnight experts," he wrote to wildlife conservancy director Muyemburuko.* "The application [for seismic testing] is indeed going ahead."

(Emphasis added.)

69.     On this news, ReconAfrica's shares fell 6% on May 11, 2021.

70.     On May 12, 2021, *New Era*, a Namibian newspaper, published an article entitled

"ReconAfrica still years away from commercial drilling" which reported the following, in relevant

part, regarding the Company's social, legal, and environmental obligations and practices:

Canadian miner ReconAfrica has moved to calm excitement around potential billions of barrels of oil *while locals and environmentalists square up for a prolonged fight with the company*.

\*       \*       \*

*However, locals have complained that they were not consulted. All People's Party (APP) Secretary General Vinsent Kanyetu in April claimed traditional authorities in the areas where ReconAfrica is exploring for oil have not been consulted.*

Kanyetu called on ReconAfrica owners or directors to engage the traditional leaders, who are the custodians of the area.

"*We consulted the Shambyu and Ukwangali traditional leaders and they don't have full information as to what is really happening* and how they are going to benefit if the resources are discovered and the oil drilling has to continue," said Kanyetu.

***Afrikaans daily Republikein reported on Monday that a family living in the area filed an affidavit with the High Court to force ReconAfrica to leave and restore the area of its second test well.***

[Ndapewoshali] Shapwanale said, "we completed numerous consultation and engagement sessions regarding our seismic and stratigraphic and ongoing project activities, directly with communities and interested stakeholders by reaching out to traditional authorities, community leaders and community members both in formal consultation community meetings and also in what is locally known as 'cluster village interaction' sessions, where we go homestead-to-homestead."

She said the company "will continue to expand our engagement activities".

Since ReconAfrica recently commenced its exploratory programme, the company is only at the initial phase of exploration. Once they have obtained 2D seismic data, this will be coupled with data acquired from the stratigraphic wells along with the seismic data whereafter experts will advise on the next steps to plan for exploratory wells. Only once these steps are done will they start with an appraisal well programme.

***Shapwanale continued that the company has not applied for, nor been granted or given any licences that may allow or support fracking, or any other form of 'unconventional' energy exploration.***

Said Shapwanale: "The well casing and drilling techniques we use ensure that there is no impact on aquifers. The wells are fully contained before we introduce our 100% organic water-based drilling fluid system. ***That system includes measures at the surface to ensure there is no possibility of contamination of water sources above or below the surface.***

Additionally, we are drilling water wells at each exploratory well location to identify and analyse aquifers that are present, provide water for our operations and provide adjacent aquifer monitoring during drilling. Following our exploratory drilling programme, the potable water wells will belong to the community."

Responding to environmental concerns, Shapwanale clarified that exploration wells have no impact on the environment. She explained that all aquifers are protected using multiple layers of casing and cement.

"Our wells will be drilled with organic and biodegradable water-based drilling fluids and we will use the most effective casing and materials to ensure complete protection of all water sources and aquifers. There is a reclamation plan for each of the exploration drill sites to return them to the initial state once operations are completed," she said.

Meanwhile, ReconAfrica emphasised that it is committed to protecting the environment, avoiding environmentally sensitive areas, minimising disturbances and implementing international petroleum industry best practice in all operations.

> *Said Shapwanale: "We are focused on conventional oil and gas reservoirs which flow naturally under their own pressure. This means minimal use of water, no hydraulic fracking, whatsoever. To further indicate that we have no interest in unconventional oil and gas, ReconAfrica has purchased and is using a Crown 750 drilling rig, a relatively small, truck-mounted drill designed for desert mobility and light impact.* Our equipment can drill to a maximum depth of 13 000 feet (4 000 metres). The rig is designed for vertical wells only, not for horizontal wells."

(Emphasis added.)

71.    On this news, ReconAfrica's shares fell $.80, or 11%, to close at $6.45 per share on May 19, 2021, damaging investors.

72.    On May 24, 2021, the Company issued a press release entitled "RECONAFRICA RESPONDS TO NATIONAL GEOGRAPHIC'S 'HIT PIECE' BY ENVIRONMENTAL ACTIVISTS" which stated the following regarding the Company's social, legal, and environmental obligations and practices, its unconventional extraction, and the Kavango Basin, in pertinent part:

> While we appreciate there may be concerns about the impact of the ReconAfrica project in Namibia, we would like to point to some important facts that should be considered when assessing the project.
> - *ReconAfrica adheres fully to the legal obligations within all territories in which it operates.* Allegations have been made in the media suggesting that this is not the case. *These are categorically untrue.* ...
> - *ReconAfrica's work in Namibia is guided by – and under the constant review and approval of – representatives of a wide range of government Ministries and regulatory agencies* including: the Ministry of Mines & Energy (MME), the Ministry of Agriculture, Water & Land Reform (MAWLR), the Ministry of Environment, Forestry & Tourism (MEFT), the Ministry of Home Affairs, Immigration, Safety & Security, and others.
>
> *            *            *
>
> The following points are in direct response to allegations raised within the National Geographic article. ...
> - *ReconAfrica's licence is for conventional early-stage exploration within the Kavango Basin. As previously noted, no licence to carry out fracing activity exists nor has been applied for.*

(Emphasis added.)

73.     On May 26, 2021, Calle Schlettwein, Namibia's Minister of Agriculture, Water and Land Reform tweeted the following:

> The MAW&LR has the mandate to manage and regulate water resources within the territory of Namibia. It is therefore important to reconfirm that Re-Con Africa [sic] has applied to drill boreholes, for both exploration and abstraction and purposes. ***Sofar*** [sic] ***however no permit has been issued.***

(Emphasis added.)

74.     On this news, ReconAfrica's shares fell nearly 2.5% on May 27, 2021.

75.     On June 23, 2021, *National Geographic* published an article entitled "Members of Congress urge investigation into Okavango oil exploration: National Geographic reporting spurs a bipartisan call for 'a thorough and coordinated investigation' by federal agencies[,]" which stated the following, in pertinent part regarding the Company's activities and their relation to various laws and legal authorities:

> Two members of the United States Congress have sent a plea to the secretary of state, the attorney general, and other top officials urging a "thorough and coordinated investigation" into concerns raised by a series of National Geographic articles about oil and gas exploration in southern Africa's spectacular and delicate Okavango region.
>
> *        *        *
>
> In the letter dated June 16, 2021, and shared with *National Geographic*, Senator Patrick Leahy, a Vermont Democrat, and Congressman Jeff Fortenberry, a Nebraska Republican, cite five articles by *National Geographic* during the past nine months as source material for their call for an investigation.
>
> *        *        *
>
> In September 2019, *Oilprice.com,* an energy news site and paid promotion site, called the search for oil in the Okavango region possibly the world's "largest oil play of the decade," a claim that experts *National Geographic* spoke to say isn't based on independent analysis. ...
>
> ReconAfrica representatives did not comment on the lawmakers' call for a U.S. government investigation. A ReconAfrica spokesperson described *National Geographic*'s reporting as "categorically untrue" and said in a written statement, "We sincerely believe that Namibia's natural resource industry can be developed in

an environmentally and socially responsible manner," adding that ReconAfrica's work in Namibia is "guided by—and under the constant review and approval of—representatives of a wide range of government ministries and regulatory agencies."

\*     \*     \*

***Leahy and Fortenberry assert that the U.S. has an interest in protecting the Okavango Delta under the Defending Economic Livelihoods and Threatened Animals (DELTA) Act, which became law in 2018, to safeguard this ecologically, culturally, and economically important part of the world.***

\*     \*     \*

Calle Schlettwein, Namibia's minister of agriculture, water, and land reform, the agency responsible for water-related permits, told *National Geographic* in a written statement in March that ReconAfrica does not yet have permits approved to extract water to use in its drilling operations or to dispose of the wastewater. ***This suggests that the company is operating in breach of Namibian government regulations.*** In its 2019 environmental assessment, ReconAfrica said it would have all permits in place before work began. ***In a tweet on May 26, Schlettwein confirmed that so far "no permit has been issued."***

\*     \*     \*

***Community members in the exploration area allege that ReconAfrica has cleared land for drilling without properly consulting or compensating local people, according to a lawsuit filed in Namibia's High Court in April by the Legal Assistance Centre on behalf of Andreas Sinonge, a farmer.*** Under Namibian law, ReconAfrica needs rights to use the land before it can clear it for drilling sites and access roads. ***The lawsuit alleges that ReconAfrica did not get this permission and must restore Sinonge's farmland.***

***ReconAfrica says its application is under review by the regional government and that it has "documented permission and consent for land use" from the local traditional authority, though it did not provide that documentation to*** National Geographic.

**Call for a multiagency investigation**

The bipartisan letter was addressed to Secretary of State Antony Blinken, Attorney General Merrick Garland, Securities and Exchange Commission Chairman Gary Gensler, and Agency for International Development (USAID) Administrator Samantha Power.

(Emphasis added.)

76.    On June 24, 2021, Viceroy Research ("Viceroy") published a report entitled "ReconAfrica – No Oil? Pump Stock: Drilling blind for oil in Namibia: ReconAfrica is a stock-promoted junior explorer drilling imaginary oil basins in a fragile ecosystem. A disaster waiting to happen." (The "June 24 Viceroy Report".)  The June 24 Viceroy Report stated the following, in pertinent part, regarding the Company's practices, unconventional extraction interest, and the Kavango Basin:

> [ReconAfrica's] mining assets are not highly speculative: they are borderline imaginary. Despite a CAD ~2bn market cap, [ReconAfrica] has a near-zero chance of finding any asset of value in their exploration site, and an even lower chance to capitalize on any find.
>
> \*       \*       \*
>
> **Drilling Blind**
> - ***Since its inception, [ReconAfrica] has consistently marketed its exploration allotment as a potential shale (unconventional) play***, highlights the drilling campaign is to confirm "organic rich shales", showcases a scenario valuation based on shale, and commissions engineering reports on unconventional basis.
>
>   o Unconventional exploration is banned by the Namibian Government. Namibia's Petroleum Commissioner, Maggy Shino, confirms "there is no way we will license [ReconAfrica] or any other company to carry out fracking or unconventional hydrocarbon exploration in Namibia". ...
>
> - [ReconAfrica] appear to have no intention on releasing any meaningful well data because they were likely colossal failures. **What is clear is that [ReconAfrica] do not have a discovery well. [ReconAfrica's] first and second wells failed to encounter oil or gas.**
>
> - **The Kavango Basin was discovered and entirely described by [ReconAfrica] insiders using legacy data.** *We find it more likely that the license area is over the Owambo basin: a well-explored but disappointing basin in Northern Namibia.*
>
> \*       \*       \*
>
> [ReconAfrica] checks every box in the SEC's guidelines as to what constitutes an oil and gas scam, and in addition to these red flags we believe there is a near-zero chance of commercial success. The two wells drilled so far have been unsuccessful – we believe drilled solely to fulfil lease requirements.

*        *        *

*[ReconAfrica's] value proposition is its so-called exploration of the Kavango Basin*, which they are conducting in an irresponsible and ineffective manner. ***The data the company currently is at an extremely early stage of basin evaluation and not sufficient for drilling exploratory wells.*** ...

*We believe this severe overreaction is the equivalent to justifying a gold mine at a beach because a metal detector pinged.*

*        *        *

**Unconventional methods**

***Since its inception, [ReconAfrica] has consistently marketed its exploration allotment as a potential shale (unconventional) play, highlights the drilling campaign is to confirm "organic rich shales", showcases a scenario valuation based on shale, and commissions engineering reports on unconventional basis.***

**This is a massive problem.**

[Images omitted.]

***Unconventional exploration is banned by the Namibian Government.***

***Namibia's Petroleum Commissioner, Maggy Shino, confirmed to Viceroy "there is no way we will license [ReconAfrica] or any other company to carry out fracking or unconventional hydrocarbon exploration in Namibia".***

***Among immense public backlash and obvious legal hurdles, [ReconAfrica] backflipped, stating they have no intention of extracting unconventional oil. [ReconAfrica] continues to falsely market unconventional studies and scenario valuations to investors, without any corrections. It pays stock promoters to push this false narrative.*** ReconAfrica also has no engineering studies with any conventional basis.

*To be clear: [ReconAfrica] does not have permission to conduct shale exploration in Namibia.*

**Convenient Conventional Backflip**

Having an invalid engineering study, facing immense public scrutiny for unconventional promotion, and no geographic analysis: [ReconAfrica] announced April 15, 2021, that they had "clear evidence of a working conventional petroleum system". This means a lot less than it seems. ***A petroleum system is any indication of oil or gas in an area, excluding any economic considerations of exploration.***

[Image omitted.]

46

*Drill deep enough in any basin on the planet and you will find a "petroleum system".*

*These press releases are akin to announcing [ReconAfrica] found a shell at the beach.*

By comparison, BP's Ghadames blocks in Libya required 30,000km$^2$ of 3D seismic, 5,500km$^2$ of 2D seismic and 17 exploration wells for an exploration area of 54,000km$^2$. **The total commitment was set at a minimum of US$900m**. The data took several years to acquire and was never used due to the First Libyan Civil War.

[ReconAfrica] board member and advisor **Shiraz Dhanani was BP's geophysicist in Libya** and is **undoubtedly aware of the cost and time associated with proper exploration of [ReconAfrica's] stake.**

\*       \*       \*

**Well, Well, Well**

Viceroy's belief is that the 3 "stratigraphic" wells drilled have virtually 0% chance for commercial discovery. *Of the two wells drilled so far, both have come up dry and [ReconAfrica's] announcements have left out key information* including:

- Any mention of mud logs, which are records of the drilling unit, subsurface geology and oil and gas encountered. - Any mention of drill depth. - Any mention of hydrocarbon intercept depth.

*We find [ReconAfrica's] omission of any mud log data to be a tacit admission of failure as these are easily readable and most companies include mentions of mud logs in their drilling updates.* [ReconAfrica's] prospectus laid out a budget for "mudlogging and communications" for both wells but have not mentioned them since.

\*       \*       \*

In an interview with Viceroy Research, Namibia's Petroleum Commissioner, Maggy Shino confirmed that the government had received cuttings and mud logs but these were proprietary data. We challenge [ReconAfrica] to release these logs to clarify the actual results of their drilling.

[ReconAfrica] has announced that it has planned 450km$^2$ of 2D seismic analysis with planning beginning in January 2021: too little, too late. We estimate this will take ~6 months to complete and cost ~CAD50m.

Accurate quotes are hard to come by for seismic analysis on an area this small. By the time 2D seismic data is available **[ReconAfrica] will have relinquished 75%**

of the original lease and only performed 2D seismic analysis over 1.03% of their original block.

*     *     *

### 5. The "Kavango" Basin

***The center of [ReconAfrica's] operations is the Kavango basin. The basin itself was identified by [ReconAfrica's] Bill Cathey in 2018 by reinterpreting legacy data gathered in 2015.*** All mentions of the Kavango basin prior to this relate to the region's water table.

[Image omitted.]

We find it interesting that every proponent of the Kavango basin's existence works for [ReconAfrica]: there is not a single study or mention of the basin that does not originate from [ReconAfrica] or its directors and management.

**The company is claiming the existence of a "previously unrecognized" Karoo basin**. [ReconAfrica] believes, **with no real supporting evidence**, that this basin will be equivalent to that of the Lower Ecca Group in South Africa.

To Viceroy's knowledge, **there has never been a suggestion of such a deposit in the area.**

[Image omitted.]

***What we believe is more likely is that [ReconAfrica's] lease is on the Owambo basin, which was explored in the 1960's with some operations today.*** [ReconAfrica's] neighbour Monitor Oil and Gas state clearly that they are operating in the Owambo basin.



*Figure 22 Aeromagnetic dataset with wells and 2D Seismic data, annotations added*

48

*Even Namcor, Namibia's national oil company, delineates the entire region as part of the Owambo basin in a March 2020 slideshow.*



Figures 23 & 24  Monitor Exploration Owambo Basin Page & Namcor APPEX 2020 presentation [23,24]

The reason behind this rebranding of the basin is clear: despite what [ReconAfrica] tells investors, *this part of Namibia has been extensively prospected, in particular after the 1960's during South Africa's oil embargo*.

[Images omitted.]

~12 wells have been drilled and 2000km$^2$ of 2D seismic undertaken in the Owambo basin, with no success.

*    *    *

*The major implication of [ReconAfrica's] obsession with promoting water resources is that water resources are only really significant to unconventional mining*, which [ReconAfrica] cannot conduct, but given enough time, they will no doubt try.

(Emphasis in original and added.) (Internal footnotes omitted.)

77.    The June 24 Viceroy Report stated the following regarding the Company's stock promotion:

**The Hype Men**

•    **The rise in [ReconAfrica's] share price has been accompanied by several shill pieces either commissioned by [ReconAfrica]** or written by parties with a clear conflict of interest. **These campaigns are clearly aimed at unsophisticated investors** unfamiliar with oil and gas exploration.

   o Every "analyst report" on [ReconAfrica's] website has been paid for by the company for favorable coverage.

-  **[ReconAfrica] has spent, at least, in the high 6-digit figures promoting their stock through** YouTubers and other unlicensed stock promoters.

   o These include a FINRA-sanctioned broker who purports to measure the total percentage of shares sold short in order to engineer a short squeeze. This is not actually possible, and just a smokescreen to hide a paid-for shill.

     \*   \*   \*

***Nonetheless the company's share price has risen 1,600% in the past 12 months due to a concerted campaign of paid stock promotion and opaque press releases aimed at unsophisticated investors.*** The management team behind [ReconAfrica] have a colorful history including bribery, environmental damages and systemic overselling of early-stage oil and gas prospects.

     \*   \*   \*

### 7. The Hype Men

2. An apparently bottomless stock-promotion slush-fund, employing crooked analysts, stock promoters, YouTubers, and ClickBait masters to promote 1,000%+ stock price targets.

This strategy has clearly paid off, duping unsophisticated investors into sending the company's share price soaring.

     \*   \*   \*

### Dinosaurs, Rockets & Blatant Stock Promotion

### Bull-Markets

As with any overhyped mining play, there is a chorus of stock promoters at the trough amplifying [ReconAfrica's] starry-eyed fiction. These schemes target unsophisticated investors with no experience in the energy space.

[ReconAfrica] have already run into issues with regulators over a German-language pump piece authored by (we kid you not) Bull Markets Media GmbH.

The pump piece was so successful [ReconAfrica] had to address unusual trading activity on the publication. Initially, [ReconAfrica] announced it had no idea why trading volumes spiked. [ReconAfrica] was then immediately "requested" by the Investment Industry Regulatory Organization of Canada (IIROC) to disclose a **CAD120k payment for a year-long "public relations" campaign** (which [ReconAfrica] did not think weas relevant to "business affairs").

*    *    *

Valuethemarkets.com, the trading name of UK firm Digitonic Ltd, have produced a series of overenthusiastic pump pieces about or mentioning [ReconAfrica], the latest of which states that it was paid USD250k thus far for their work. The promotional drive appears to have started on September 30, 2020. On that same day [ReconAfrica] shares started trading on the OTCQX exchange under the ticker RECAF.

[Image omitted.]

*Note that this amount differs from article to article, clearly showing that [ReconAfrica] is actively soliciting promoters to pump their stock price through paid advertisements.*

## YouTube-ing

To capture the day-trading retail crowd, Digitonic enlisted YouTube user Zac Hartley to pump the stock on his channel for the low price of CAD1,000 (the currency is not specified but based on his location in Calgary we assume CAD).

[Image omitted.] **Newsletters**

[ReconAfrica] also engaged the services of **disgraced broker Thomas C Ronk** through his "newsletter" at buyins.net which purports to monitor short selling and naked short selling of a specific security intending to engineer a short squeeze. Having asked many market participants, many found this to be technically impossible. Ronk received ~USD40k for his services which include advertising.

Ronk's license was suspended by FINRA ... for failing to pay a USD50k fine relating to undisclosed trading.

[Image omitted.]

## Analysts for Hire

[ReconAfrica's] "Analyst Reports" page on its website features only two firms: Haywood Securities and Quester Advisors. Haywood Securities make the following disclosures showing significant conflicts of interest:

[Image omitted.]

Haywood securities analysts and managers have been involved in several misdemeanors including:

- **Failing to detect pump and dump schemes, all of which were junior oil and gas explorers**: Sun Cal Energy Inc, Fox Petroleum Inc and Petrosouth Energy.

- Inappropriately investing a widow's funds into junior mining stocks causing a loss of half her investment.

- Failing to observe Know Your Client rules, effecting trades in client accounts without authorization.

- An upcoming hearing for an advisor accused of engaging in excessive trading in client accounts not within the bounds of good business practices.

Haywood have also assigned the Kavango Basin a 27% chance of commercial success without justification.

[Image omitted.]

The other firm, Quester Advisors, has only one report with the following disclosures:

[Image omitted.]

Quester Advisors appears to be a one-woman show run by former Canaccord Genuity analyst Jenny Xenos, and the author of the report is listed as "jenny" in its document properties. Xenos had previously covered Renaissance Oil at Canaccord, where she assigned a CAD0.80 per share target price. This was never achieved.

This concerted effort to shape investment in [ReconAfrica] as a "sure thing", especially targeting unsophisticated investors, is a clear sign that **[ReconAfrica] is aiming to entice those without the depth of knowledge required to analyze their investment**.

*      *      *

***[ReconAfrica] is a tale as old as time: roping in unsophisticated investors with the promise of "sure-thing" returns by significantly misrepresenting the true situation of the company.*** The company, despite its protestations, is at an extremely early stage of exploration with no real knowledge of the Kavango basin, or if any commercial resources reside within. ...

[ReconAfrica's] use of paid and conflicted promotional agencies is a bald-faced admission that they intend to deceive unsophisticated investors. We believe such investors are the driving force behind [ReconAfrica's] current share price and will ultimately be burned when the fiction is revealed as such.

(Emphasis in original and added.) (Internal footnotes omitted.)

78.    On this news, Recon Africa's shares fell $1.90, or 17%, on June 25, 2021.

79.     On June 28, 2021, the Company issued a press release entitled "RECONAFRICA RESPONDS TO SHORT SELLER'S BIASED AND FALSE SHORT REPORT" which stated the following, in pertinent part, regarding the June 24 Viceroy Report:

> Reconnaissance Energy Africa Ltd. (the "Company" or "ReconAfrica") (TSX-V: RECO) (OTCQX: RECAF) (Frankfurt: 0XD) provides the real facts in response to falsehoods and distortions from a recent short seller's report.
>
> *1- ReconAfrica was the first to recognize the deep Kavango Basin as a distinct geological feature.* ReconAfrica purchased aeromagnetic survey data which the Government of Namibia had commissioned, and had this data processed by Earthfield Technology, based in Houston Texas, one of the world's leading specialists in quantitative analysis of magnetic and gravity data. Earthfield's analysis yielded detailed, three-dimensional images of the basement surface of the Kavango Basin, and **further defined it as geophysically separate from the Owambo Basin to the west**. A new view of the regional geology resulted in the Kavango rift play that ReconAfrica is pursuing.

(Emphasis added.)

80.     On July 14, 2021, Viceroy published a report entitled "ReconAfrica – Polarization & Disengagement" (the "July 14 Viceroy Report") which stated the following, in pertinent part, regarding the Company's objectives, practices, and unconventional extraction interest:

**6-1 well non-announcement**

[ReconAfrica] also announced the completion of drilling of their 6-1 well in a press release almost entirely devoid of all other information including the depth achieved, and the age or depth of any shows.

*        *        *

**Back-pedaling on Fracking, Again!**

***Buried in the statement is the clear admission that the company has not completely ruled out fracking. Instead, the company says that "the Namibian people and authorities will determine if and how they will extract that reserve.".*** [sic]

[Image omitted.]

Viceroy have previously interviewed Namibia's Petroleum Commissioner Maggy Shino who stated unequivocally that no fracking would take place on Namibian

soil. Once again [ReconAfrica] is changing the narrative around the true footprint of their activities.

(Emphasis added.)

81.    The July 14 Viceroy Report stated the following, in pertinent part, regarding the

Company's social, legal, and environmental obligations and practices:

**ESG Pamphlet**

Earlier this morning ReconAfrica released an ESG statement through their Twitter account. This is perhaps one of the most insulting pamphlets [ReconAfrica] have ever released, and a slap-in-the-face for Namibian stakeholders. Viceroy anticipated this ESG campaign would eventuate to try to rebuke our claim, so we saved the best for last.

*        *        *

**Polarization and Disengagement**

Rainbows and puppies are all ReconAfrica want you to see, and portray their ESG evangelists as disinterested benefactors to the Namibian people. This could not be further from the truth. ...

[Image omitted.]

While the purpose of the consultation was ostensibly to provide information on the 2-D seismic survey, the company used it as an impromptu Q&A session. Fortunately, such meetings were filmed by NMH. You can find the link below.

https://www.youtube.com/watch?v=FaHMVRmjPnQ&t=2900s

Here is what passes for [ReconAfrica] "Consultation and Engagement":
•    Mr. Mwiya, [ReconAfrica's] retained EIA consultant and apparent representative, justifies the torrent of online harassment by [ReconAfrica] shareholders directed at Ms. Ina-Maria Shikongo on Frack-Free Namibia, and notes that he also takes part in this harassment. This is absolutely appalling. [55:40]
•    Mr. Mwiya sarcastically mocks representatives from indigenous communities who raise questions about displacement of communities in the event of oil discovery. [1:10:40]
•    Mr. Mwiya and Claire Preece, ReconAfrica's local ESG representative, constantly interrupt local stakeholders asking pertinent questions.
•    Mr. Mwiya frequently becomes frustrated at any non-technical ESG questions, and resorts to yelling at local stakeholders and turning his back while they ask him questions.

*But could [ReconAfrica] provide factual, straightforward answers to basic technical questions? Also no.* [ReconAfrica] spokesperson Claire Preece and Risk-Based Solutions' Dr Mwiya:

- Confirmed that the company is only drilling wells in order to retain its license. [48:00]
- *Stated several times that there is no data available for the lease area which is patently untrue.* In addition to the Namibian governments aeromagnetic surveys there is also gravity data, multiple Etosha wells and decades of failures to extract oil and gas.
- Categorized the estimates of the basin's size and contents as "promotional" when challenged on how the company could make such bold claims on almost no data. [1:03:04]
- Defended their approach of drilling wells before seismic despite several geologists in the audience pointing out that this is an incorrect, completely not-normal approach.
- *Despite being asked on multiple occasions if ReconAfrica would categorically state no fracking would be conducted, Ms. Preece avoided the question and cut off members of the gallery, one time even stating that she "won't be around" at that point.* [1.30.20]

*It is worth nothing that these questions were being asked by experienced geologists*, of which we could identify **a former onshore and offshore geologist for BP** and **Dr Roy Miller, former director of Namcor** between 1992 and 1998 and **former director of the Geological Survey of Namibia** from 1979 to 1992.

**Keeping it sleazy**

Despite his promotional tone, Mr Mwiya is also responsible for the registration of interested and affected parties for the public consultation regarding the 2D seismic program, in which he should be impartial.

(Emphasis added.) (Internal footnotes omitted.)

82.     On this news, ReconAfrica's shares fell $0.72, or 8%, on July 15, 2021.

83.     On August 5, 2021, the Company issued a press release entitled "RECONAFRICA & NAMCOR PROVIDE ADDITIONAL DRILLING RESULTS AND PLANS FOR NEXT EXPLORATION PHASE IN THE KAVANGO BASIN" which stated the following, in pertinent part, regarding the Company's objectives, practices, and interests:

Reconnaissance Energy Africa Ltd. (the "Company" or "ReconAfrica") (TSX-V: RECO) (OTCQX: RECAF) (Frankfurt: 0XD) and its joint venture partner NAMCOR (the state oil company of Namibia) are pleased to provide, based on the mud logging report and geochemical analysis, more comprehensive data

confirming a working conventional petroleum system. The Company also reports on additional drilling results and plans for the next phase of exploration in the Kavango Basin, NE Namibia and NW Botswana.

HIGHLIGHTS:
- The 6-2 well and 6-1 well reached total depths of 2,294 meters (7,526 feet) and 2,780 meters (9,121 feet) respectively.
- The 6-2 well had over 250 meters (820 feet) of hydrocarbon shows while the 6-1 had over 350 meters (1,148 feet) of hydrocarbon shows. ...

Scot Evans, Chief Executive Officer of ReconAfrica, commented:
"The goal of the stratigraphic test well program, approved by the Namibian government, was to establish the presence of a working conventional hydrocarbon system in this new basin. *The results we have achieved from these first two wells have significantly exceeded our expectations. Not only have we encountered a significant number of oil and gas shows over multiple potential zones, they are associated with zones of fracture and matrix porosity.* Consistent with a conventional oil and gas play, analysis of the geochemical data from these wells indicates the hydrocarbons are migrated from off structure source(s) (see figure below). The findings of these two wells strongly supports acquiring, processing, and interpreting the first 2D seismic program in the Kavango sedimentary basin and its multiple sub-basins. *This is just the beginning; the 6-2 and 6-1 wells provide a positive initial evaluation of a small component within our acreage position of 8,500,000 acres in Namibia and Botswana.*"

(Emphasis added.) (Internal footnotes omitted.)

84.     On August 16, 2021, Viceroy published a report entitled "ReconAfrica – Drilling Update Response: Disappointing drill results confirm ReconAfrica's 'Kavango deep' basin is geofantasy as their promotional claims unravel[,]" which stated the following, in pertinent part, regarding the Company's interests and practices and the Kavango Basin:

On August 5, 2021, ReconAfrica released a press release containing further results on their 6-2 and 6-1 wells. *Far from a success, results have failed to live up to [ReconAfrica's] exaggerated claims of a world-class reservoir and instead showed an area of limited to negligible production potential.*

**Announcement Let-Down**

•     All significant data presented in the press release was from RECO's first well (**6-2**), which ceased drilling on April 7, 2021, almost 4 months ago. There is no reason to delay findings this long unless, as we believe, RECO have run these results through every process known to man to report indicators of oil. **The**

indicators are not good, and [ReconAfrica] appear to have withheld the most significant Wireline results.

• On July 14, 2021, [ReconAfrica] announced that they were commencing "full suite logging" of the 6-1 well. Wireline log data are the key data used by the industry to determine success or failure for all wells. Every oil and gas company bases their press releases around this data which can be acquired in a few days and interpreted in a couple of hours. *The fact that [ReconAfrica] are withholding this data from the 6-2 well, completed 4 months ago, and the 6-1 well, completed 1 month ago, is a clear indication of failure.*

• *Neither their 6-2 or 6-1 wells reached their planned target depths of 12,500ft instead finishing at 7,526ft and 9,121 ft.* The company stated that this was due to safety concerns which would likely have been mitigated by conducting 2D seismic analysis prior to drilling. We suspect the real reason was their drill bits penetrating basement rock at TD, **debunking their deep basin theory**.

[Images omitted.]

**Where is Schlumberger?**

• [ReconAfrica] previously claimed that their well logging would be conducted by respected industry giant Schlumberger (NYSE:SLB) but was in fact done by Horizon Well Logging, an unknown minor player based in the US. ...

• *According to Horizon Well Logging's show report, the majority of the oil and gas shows are at extremely shallow depths with lower depths showing no real production potential. Not only does this disprove ReconAfrica's claim of "6,000ft of Permian aged source rock", it casts incredible doubt on their 120bbl OOIP (Original Oil in Place) promotion."* [sic]

\* \* \*

• *Geologists consulted by Viceroy believe that the Zone 2 and Zone 3 carbonates are far older than Permian, a fact that would unravel the company's overhyped 30,000ft deep Permian basin model.* In their view, Zones 2 and 3 are far more likely to be Cambrian to Precambrian aged Otavi Group carbonates *consistent with Owambo Basin stratigraphy*. We expect the company to pivot to promoting these inferior, older, dolomitized deposits as "self-sourcing" after failing to find any Permian aged source rocks: the primary target of [ReconAfrica's] initial stratigraphic test wells.

• [ReconAfrica] structural geologist James Granath stated in an inversion tectonics webinar on April 30, 2021: "It [the 6-2 well] encountered about 800 meters of carbonates sitting underneath 300 to 400 meters of Upper Karoo."
*This statement is consistent with expected Owambo Basin stratigraphy where thin*, Permian-aged Upper Karoo clastics exist above thicker, Cambrian to Precambrian aged carbonates. The stated thicknesses also support Viceroy's belief that the 6-2 well drilled through thin Ecca group clastics (Zone 1, from ~700m to ~1,100m in the 6-2 well) and thicker Otavi group carbonates (Zones 2 and 3, from ~1,100m to ~1,900m in the 6-2 well).

**Same Old Games**

- ***In an interview with Viceroy Research, Namibia's Petrol Commissioner Maggy Shino confirmed that the Ministry of Mines and Energy had access to the mud logs from the 6-2 well far in advance of their release.*** We question why Namibia continues to support [ReconAfrica] considering their own access these extremely disappointing drill results.

*     *     *

In conclusion we fail to see how these results are indicative of a basin that was compared to some of the largest producers in the world. The company's pivot to a measured tone is a far cry from their previous rhetoric of "30,000ft Permian Age" basin and "6,000ft petroleum systems". ...

Viceroy Research have reiterate our belief that [ReconAfrica] is at its core a pump-and-dump scheme to dupe investors, and a very predictable one at that.

(Emphasis added.)

85.    On this news, ReconAfrica's shares fell $0.46, or 8%, to close at $4.70 per share on August 17, 2021.

86.    On August 17, 2021, the Company issued a press release entitled "RECONAFRICA RESPONDS TO NEW MISINFORMATION CAMPAIGN" which stated the following, in pertinent part, regarding the Company's objectives, practices, unconventional extraction interest, and its social, legal, and environmental obligations and practices:

> ***To correct the misinformation disseminated today by the short-seller, ReconAfrica can summarize and reaffirm the intention and recent results of the exploratory drilling program it began in Namibia***, as follows:
> - ReconAfrica, in collaboration with the Government of the Republic of Namibia, set out this year with a stratigraphic drilling program to prove there is an active conventional petroleum system in the Kavango Sedimentary Basin. The released data and analysis from the first well confirm this. In conventional oil and gas systems, petroleum migrates along faults, fractures, or porous rock from a source to a reservoir. We are confident that this data confirms we have a conventional petroleum system. ***No fracing is planned or permitted by the Government of Namibia. Find a summary from our first stratigraphic well HERE.*** [Hyperlink omitted.]
> - Based on the promising results of the first two stratigraphic test wells, ReconAfrica has initiated a government-approved, low-impact, 2D seismic program (Seismic Fact Sheet) [hyperlink omitted] designed to delineate

58

potential hydrocarbon-bearing reservoirs to aid in the assessment of establishing commerciality in the Kavango Sedimentary Basin. ...

***ReconAfrica is committed to working in close collaboration with the government of Namibia to fully explore and understand the potential of the Kavango Sedimentary Basin*** and explore for commercial petroleum reservoirs. ***It also communicates frequently with regulators, investors and credible research organizations to share its findings and ensure full transparency throughout this exploratory phase.***

(Emphasis added.)

87.    On September 2, 2021, the Company issued a press release entitled "NETHERLAND SEWELL STUDY IDENTIFIES 5 POTENTIAL CONVENTIONAL OIL AND GAS RESERVOIR ROCK ZONES IN THE FIRST WELL (6-2) IN THE KAVANGO BASIN, NAMIBIA" which stated the following, in pertinent part, regarding the Company's objectives and practices:

According to Nick Steinsberger, the Company's Senior Vice President Drilling & Completions, "The NSAI study complements the sample logs and geochemical data by demonstrating the presence of reservoir quality rocks in the first stratigraphic test well in Namibia. The oil and gas shows that were reported from the logs at the well site are from reservoir quality rock intervals. The first carbonate reservoir zone, for example, contains core with 17% porosity, several millidarcy permeability (reservoir quality permeability) and some fracture porosity. Porosity reflects the storage capacity of a reservoir rock whereas permeability describes the ability to flow through the rock. ***The goals of ReconAfrica's stratigraphic tests have been achieved with remarkable success*** in an unexplored basin and enable the initiation of the next phase of petroleum exploration efforts in the Kavango basin."

(Emphasis added.)

88.    The statements referenced in ¶¶ 58-61, 64-67, 72, 79, 83, and 86-87 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) ReconAfrica's plan for using unconventional means for energy extraction (including fracking) in the fragile Kavango area; (2)

that ReconAfrica would begin unlicensed drilling tests; (3) that ReconAfrica would illegally use water for well testing; (4) that ReconAfrica would illegally store used water in unlined pools; (5) that ReconAfrica would skirt Namibian law and hire an inadequate and inappropriate consultant; (6) that, as a result, ReconAfrica risked future well, drilling, and water-related licenses in Namibia and Botswana; (7) that, as opposed to its representations, ReconAfrica did not reach out nor provide adequate information (including in relevant local languages) through accessible means to those to be impacted by its testing and potential energy extraction; (8) that ReconAfrica's interests are in the Owambo Basin, not the so-called Kavango Basin; (9) that ReconAfrica has continuously engaged in stock pumping; and (10) as a result of the foregoing, Defendants' public statements were materially false and/or misleading at all relevant times.

## THE TRUTH EMERGES

89.    On September 7, 2021, Viceroy published a report entitled "ReconAfrica – Another swing, another miss: Despite significant polish, Netherland Sewell's presentation on ReconAfrica's 6-2 well is another set of disappointing results[,]" which stated the following, in pertinent part, regarding the Company's objectives, practices, and interests:

> On September 2, 2021, ReconAfrica released a press statement and presentation of data on their first 6-2 well by Netherland, Sewell & Associates, Inc. ***The presentation is a clear attempt to put a positive spin on disappointing drill results but fails to do so under further scrutiny.***
>
> [Link omitted.]
>
> Viceroy's analysis of the presentation confirms our dim view of [ReconAfrica's] chances of commerciality in a conventional oil play. ***The 6-2 well is effectively a failure with the porous 950 zone completely saturated with water and the 1350 zone too tight for a conventional commercial play or even reliable readings of water saturation.***
>
> ***We would have liked to analyze the logs further, but some parts have been compressed so heavily they are unreadable, we believe intentionally.*** ...
>
> **Shallow zones**

The 950 zone would have potential to be a developable reservoir with decent porosity of 19-20%, if only there were any hydrocarbons in the zone.

*     *     *

**Deeper zones**
***The deeper zones from 1350 below, which [ReconAfrica] are focused on promoting as validation of the geologic model, are even more disappointing.*** It appears to be a thin, slightly porous zone within an extremely tight section. Viceroy's expert consultants view it as a real stretch to consider this zone as reservoir rock considering the lack of top seal and porous carbonate underneath.

***[ReconAfrica] and Haywood interpret the 56% and 61% water saturation values as indicative of 44% and 38% oil saturation. This is a major misrepresentation of the drill results.***

*     *     *

**Further, the zones of lower resistivity have been interpreted as hydrocarbon bearing, a break from conventional wisdom.** Hydrocarbon bearing zones or zones of very high porosity have a higher resistivity than surrounding formation waters containing dissolved salts. No explanation was given for this apparent contradiction.

The presentation lacks any data on formation water resistivity which can be obtained from formation water salinity through the Archie and Simandoux equations. Proper analysis would require a water sample which Netherland Sewell do not allude to, only stating that water saturation estimates based on log data. An error in their water resistivity values could easily move the water saturation values, especially in the low porosity 1350 level.

*     *     *

***Even if the zone were to be hydrocarbon-bearing, it would require fracking to exploit.*** Fracking is illegal in Namibia and Namibia's petroleum commissioner Maggy Shino confirmed to Viceroy that no company would obtain permission to frack on Namibian soil. ***Despite this, [ReconAfrica] has refused to categorically rule out fracking as an option.***

*     *     *

Note that log interpretation was released almost 5 months after the completion of drilling on the 6-2 well even though this log interpretation data would have been available days after they logged the well. Netherland Sewell note that "Core Labs data is forthcoming" and we expect their results to have the same overly positive spin.

> ***[ReconAfrica] are committed to drip-feeding overly positive press releases in the hope of boosting their share price.*** This release, including its rosy interpretation and (we believe intentionally) unreadable logs is no different. We have challenged the company several times to provide clear empirical data on their wells which they have manifestly failed to do.

(Emphasis added.)

90.     On this news, ReconAfrica's shares fell $0.68, or 12%, to close at $4.65 per share on September 7, 2021, further damaging investors.

91.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

92.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of ReconAfrica during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

93.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the OTC. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of

the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

94.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

95.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

96.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants' acts as alleged violated the federal securities laws;

(b)    whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)    whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether the Individual Controlling Defendants and Individual Spokespeople Defendants caused the Company to issue false and misleading SEC and SEDAR filings and public statements during the Class Period;

(e)    whether Defendants acted knowingly or recklessly in issuing false and misleading SEC and SEDAR filings and public statements during the Class Period;

(f)    whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

97.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

98.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the OTC, and was covered by market analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g)     Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's share price during the Class Period.

99.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

100.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

101.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

102.    This Count is asserted against the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

103.    During the Class Period, the Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

104.    The Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

105.    The Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by their control over, and/or receipt and/or modification of the Company's allegedly

materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

106.    Individual Controlling Defendants, who are senior officers and/or a directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

107.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Defendants' false and misleading statements.

108.    Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Defendants' misleading statements and by the material adverse information which the Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

109.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

110.   By reason of the foregoing, the Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

### COUNT II
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Controlling Defendants**

111.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

112.   During the Class Period, the Individual Controlling Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

113.   As officers and/or directors of a publicly owned company, the Individual Controlling Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

114.   Because of their positions of control and authority as senior officers, the Individual Controlling Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period.  Throughout the Class Period, the Individual Controlling Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.  The Individual Controlling Defendants, therefore, were controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, the Individual Controlling

Defendants participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

115.    The Individual Controlling Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions and/or being a director of the Company, the Individual Controlling Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein.  The Individual Controlling Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

116.    By reason of the above conduct, the Individual Controlling Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: December 13, 2021

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
Thomas Przybylowski
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com
tprzybylowski@pomlaw.com

BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Counsel for Plaintiff*

Tuesday, November 2, 2021

## ReconAfrica (RECAF)

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.  I make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Reconnaissance Energy Africa Ltd. ("ReconAfrica" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire ReconAfrica securities at the direction of plaintiffs counsel, or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.  I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired ReconAfrica securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  The attached sheet lists all of my transactions in ReconAfrica securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.  I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.  I declare under penalty of perjury that the foregoing is true and correct.


**Name**

**Print Name**

Ahmed Huq

**Signature**

**Reconnaissance Energy Africa Ltd. (f/k/a Lund Enterprises Corp.) (RECAF)**          **Huq, Ahmed**

**List of Purchases and Sales**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 7/15/2021 | 1,000 | $7.9000 |